David E. Stanley (SBN 144025)
REED SMITH LLP
355 South Grand Avenue, Suite 2900
Los Angeles, CA 90071-1514
Telephone: (213) 457-8000
Facsimile: (213) 457-8080
dstanley@reedsmith.com
kinsogna@reedsmith.com

Michael X Imbroscio *(pro hac vice)*
Phyllis A. Jones *(pro hac vice)*
Kathleen E. Paley *(pro hac vice)*
COVINGTON & BURLING LLP
One CityCenter
850  Tenth Street, NW
Washington, DC 20001
Telephone: (202) 662-5868
Facsimile: (202) 778-5868
mimbroscio@cov.com
pajones@cov.com
kpaley@cov.com

Attorneys for Defendant
Eli Lilly and Company

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CLAUDIA HERRERA and PETER LOWRY,<br><br>      Plaintiffs,<br><br>v.<br><br>ELI LILLY AND COMPANY, an Indiana corporation,<br><br>      Defendant. | Case No. CV 13-02702 −SVW−MAN<br><br>**NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT PURSUANT TO FED. R. CIV. P. 56(a)**<br><br>Date:      March 9, 2015<br>Time:      1:30 PM<br>Location:   Courtroom 6<br><br>Hon. Stephen V. Wilson |

# NOTICE OF MOTION

TO PLAINTIFFS AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on March 9, 2015, at 1:30 P.M. or as soon thereafter as the matter may be heard in Courtroom 6 of the United States District Court, Central District of California, Western District, located at 312 N. Spring Street, Los Angeles, California 90012, defendant Eli Lilly and Company will move the Court for summary judgment on all claims of Plaintiffs Claudia Herrera and Peter Lowry pursuant to Rule 56 of the Federal Rules of Civil Procedures.

The Motion will be based on this Notice of Motion and Motion, the Memorandum of Points and Authorities set forth below, the Declaration of Kathleen E. Paley, the Statement of Uncontroverted Facts and Conclusions of Law, the pleadings, records, and files in this action, and such other further evidence and argument as may be presented at the time of the hearing.

This motion is made following a conference of counsel pursuant to L.R. 7-3, which took place on Thursday, January 29, 2015.

DATED: February 5, 2015                    Respectfully Submitted,

                                           _____/s/ David E. Stanley_____
                                           David E. Stanley
                                           REED SMITH LLP

                                           Michael X Imbroscio *(pro hac vice)*
                                           Phyllis A. Jones *(pro hac vice)*
                                           Kathleen E. Paley *(pro hac vice)*
                                           COVINGTON & BURLING LLP

                                           Attorneys for Defendant
                                           ELI LILLY AND COMPANY

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

# TABLE OF CONTENTS

Page

Table of Authorities ................................................................................................. ii

MEMORANDUM OF POINTS AND AUTHORITIES ........................................... 1

I.    INTRODUCTION ................................................................................... 1

II.   SUMMARY OF UNDISPUTED FACTS ............................................... 3

    A.    Ms. Herrera's history of treatment-resistant depression and anxiety ... 3

    B.    Dr. Braunstein's understanding of the risk of antidepressant discontinuation ................................................................................. 4

    C.    Ms. Herrera's discontinuation of Cymbalta ........................................ 8

III.  ARGUMENT ............................................................................................ 9

    A.    Dr. Braunstein independently understood Cymbalta's discontinuation risks ...................................................................... 10

    B.    Plaintiffs' preferred warning would not have changed Dr. Braunstein's prescribing decision ................................................ 13

    C.    Ms. Herrera's failure-to-warn claims subsume her remaining claims. ....................................................................................... 15

    D.    The record does not support Ms. Herrera's punitive damages claim. ............................................................................................ 17

CONCLUSION .................................................................................................. 19

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT
PURSUANT TO FED. R. CIV. P. 56(a)

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Altman v. PNC Mortg.,*
850 F. Supp. 2d 1057 (E.D. Cal. 2012) ............................................................. 17

*Anderson v. Liberty Lobby, Inc.,*
477 U.S. 242 (1986) .................................................................................... 9, 17

*Bhagvandoss v. Beiersdorf, Inc.,*
723 S.W.2d 392 (Mo. 1987) ........................................................................... 18

*Brown v. Super. Ct. of the City & Cnty. of S.F.,*
44 Cal. 3d 1049 (1988) ................................................................................... 17

*Carlin v. Super. Ct.,*
920 P.2d 1347 (Cal. 1996) .............................................................................. 10

*Carnes v. Eli Lilly & Co.,*
2013 U.S. Dist. LEXIS 176201 (D.S.C. Dec. 16, 2013) .................. 2, 13, 15, 16

*Celotex Corp. v. Catrett,*
477 U.S. 317 (1986) .................................................................................... 9, 20

*De Luryea v. Winthrop Laboratories,*
697 F.2d 222 (8th Cir. 1983) .......................................................................... 18

*Dudley v. Bungee Int'l Mfg. Corp.,*
1996 U.S. App. LEXIS 1267 (4th Cir. Jan. 31, 1996) ..................................... 18

*Felix v. Hoffmann-La Roche, Inc.,*
540 So. 2d 102 (Fla. 1989) ............................................................................. 12

*Gaghan v. Hoffman-LaRoche Inc.,*
2014 N.J. Super. Unpub. LEXIS 1895 (App. Div. Aug. 4, 2014). .................. 14

*Gonzalez v. United States,*
2011 U.S. Dist. LEXIS 107455 (E.D. Cal. Sept. 21, 2011) ............................ 17

*Heston v. Taser Int'l., Inc.,*
431 Fed. Appx. 586 (9th Cir. 2011) ................................................................ 18

*Hoffman-La Roche Inc. v. Mason,*
27 So. 3d 75 (Fla. Dist. Ct. App. 2009) (per curiam) ...................................... 16

*Huntman v. Danek Med.,*
1998 U.S. Dist. LEXIS 13431 (S.D. Cal. July 24, 1998) ................ 2, 10, 11, 16

*Kirsch v. Picker Int'l, Inc.,*
753 F.2d 670 (8th Cir. 1985) .......................................................................... 12

*Latiolais v. Merck & Co.,*
2007 U.S. Dist. LEXIS 101857 (C.D. Cal. Feb. 6, 2007) ............................... 16

*Lazar v. Hertz Corp.,*
69 Cal. App. 4th 1494 (1999) ......................................................................... 17

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,*
475 U.S. 574 (1986) .................................................................................... 9, 19

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

*McDowell v. Eli Lilly & Co.*,
--- F. Supp. 2nd ---, 2014 U.S. Dist. LEXIS 157819
(S.D.N.Y. Nov. 6, 2014)
.................................................................................................2, 13, 15, 16

*Misouria v. Eli Lilly & Co.*,
2009 U.S. Dist. LEXIS 57215 (E.D.N.Y. June 24, 2009), *aff'd*, 394 F.
App'x 825 (2d Cir. 2010) ...................................................................................14

*Motus v. Pfizer Inc.*,
196 F. Supp. 2d 984 (C.D. Cal. 2001), *aff'd*, 358 F.3d 659 (9th Cir.
2004) ....................................................................................................2, 9, 10, 14, 16

*nSight, Inc. v. PeopleSoft, Inc.*,
296 F. App'x 555 (9th Cir. 2008)........................................................................17

*Odom v. G.D. Searle & Co.*,
979 F.2d 1001 (4th Cir. 1992) ............................................................................12

*In re Oracle Corp. Secs. Litig.*,
627 F. 3d 376 (9th Cir. 2010) ...............................................................................9

*Plenger v. Alza Corp.*,
11 Cal. App. 4th 349 (1992) ...............................................................................11

*Plummer v. Lederle Labs.*,
819 F.2d 349 (2d. Cir. 1987) ..............................................................................13

*Porterfield v. Ethicon*,
183 F.3d 464 (5th Cir. 1999) ..............................................................................12

*Ralston v. Smith & Nephew Richards, Inc.*,
275 F.3d 965 (10th Cir. 2001) ............................................................................16

*Rosburg v. Minn. Mining & Mfg. Co.*,
181 Cal. App. 3d 726 (1986) ....................................................................2, 11, 13

*Saavedra v. Eli Lilly & Co.*,
2013 U.S. Dist. LEXIS 90481 (C.D. Cal. June 13, 2013).............................9, 10

*Sager v. Hoffman-La Roche, Inc.*,
2012 WL 3166630 (N.J. Super. Ct. App. Div. Aug. 7, 2012).........................16

*Salvio v. Amgen Inc.*,
2012 U.S. Dist. LEXIS 19009 (W.D. Pa. Feb. 15, 2012)..................................18

*Thomas v. Abbott Labs.*,
2014 U.S. Dist. LEXIS 109905 (C.D. Cal. July 29, 2014) ...............................10

*Toole v. Baxter Healthcare Corp.*,
235 F.3d 1307 (11th. Cir. 2000) .........................................................................18

*Tucker v. Wright Med. Tech., Inc.*,
2013 U.S. Dist. LEXIS 38354 (N.D. Cal. Mar. 19, 2013) ..........................10, 14

*Wheat v. Pfizer, Inc.*,
31 F.3d 340 (5th Cir. 1994) ................................................................................16

*In re: Zyprexa Prods. Liab. Litig.*,
2009 U.S. Dist. LEXIS 57218 (E.D.N.Y. June 22, 2009), *aff'd*, 394 F.
App'x 823 (2d Cir. 2010) ...................................................................................14

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

– iii –

**Statutes**

Cal. Civ. Code § 3294(a) ......................................................................17
California Unfair Competition Law................................................16, 17

**Other Authorities**

Fed. R. Civ. P. 56............................................................................9
Perahia, David.  "Symptoms following abrupt discontinuation of
   duloxetine treatment in patients with major depressive disorder."  89
   J. of Affective Disorders 207 (2005) .........................................6

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I.   INTRODUCTION

An inherent risk of stopping any antidepressant therapy is the potential for a patient to experience certain unwanted effects, which the medical community describes as "discontinuation" symptoms.  The medical community understands the potential for these discontinuation symptoms, practice guidelines discuss this risk, and all antidepressant labeling includes information about this phenomenon.  Despite this widespread knowledge and her own practitioner's familiarity with this risk, Plaintiff Claudia Herrera alleges that Eli Lilly and Company ("Lilly") did not adequately warn of the risk of these symptoms upon discontinuing Cymbalta®, an FDA-approved prescription medication used to treat various psychiatric and pain disorders.

Ms. Herrera began taking Cymbalta in 2007 after other medications failed to provide relief for her recurrent depression.  At that time, Cymbalta's FDA-approved label explained the risk of discontinuation symptoms in a detailed, three-paragraph warning, just as it had since the FDA's initial approval in 2004.  The Cymbalta label expressly described the risk of discontinuation symptoms, included a list of symptoms that Cymbalta patients in clinical trials reported at significantly higher rate than placebo patients – dizziness, nausea, headache, paresthesia (electrical shock sensations), vomiting, irritability, and nightmare – and provided physicians with explicit guidance about how to safely discontinue Cymbalta.

After five years on Cymbalta, Ms. Herrera decided it was "time to get off any drugs" and discontinued the medicine.  She initially consulted with her physician about this decision, but chose not to follow his advice or the guidance in the Cymbalta label when she allegedly began experiencing discontinuation symptoms.  Ms. Herrera criticizes the extensive warnings Lilly provided to physicians about the risks associated with Cymbalta discontinuation and further claims that stronger warnings

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

1   would have prevented her original prescribing physician, Dr. Mark Braunstein, from

2   prescribing Cymbalta for her.

3         Lilly firmly believes that the discontinuation warning included in Cymbalta's

4   FDA-approved label is adequate as a matter of law.  But the Court need not reach the

5   issue of the adequacy of the warning because there is a more straightforward and

6   immediate basis for granting summary judgment:   the undisputed factual record

7   demonstrates that Ms. Herrera cannot demonstrate a causal link between any alleged

8   deficiency in the Cymbalta label and her claimed injuries.  *See Motus v. Pfizer Inc.*,

9   196 F. Supp. 2d 984, 991 (C.D. Cal. 2001) (*Motus I*), *aff'd*, 358 F.3d 659 (9th Cir.

10  2004) (*Motus II*).  Two distinct grounds support this conclusion.

11        ***First***, Dr. Braunstein's independent awareness of the risk of Cymbalta

12  discontinuation symptoms breaks any possible chain of causation that an inadequate

13  warning led to her injuries.  *See Huntman v. Danek Med.*, 1998 U.S. Dist. LEXIS

14  13431 at *20 (S.D. Cal. July 24, 1998); *Rosburg v. Minn. Mining & Mfg. Co.*, 181

15  Cal. App. 3d 726, 735 (1986).   Two federal courts evaluating Cymbalta

16  discontinuation cases have granted summary judgment on these exact grounds.  *See*

17  *McDowell v. Eli Lilly & Co.*, --- F. Supp. 2nd ---, 2014 U.S. Dist. LEXIS 157819

18  (S.D.N.Y. Nov. 6, 2014); *Carnes v. Eli Lilly & Co.*, 2013 U.S. Dist. LEXIS 176201

19  (D.S.C. Dec. 16, 2013).  California law supports the same result here.

20        ***Second***, Dr. Braunstein testified explicitly that stronger warnings would not

21  have changed his decision to prescribe Cymbalta for Ms. Herrera.  His testimony is

22  fatal to Plaintiffs' case because a claim based on insufficient warnings "cannot survive

23  summary judgment if stronger warnings would not have altered the conduct of the

24  prescribing physician."  *Motus II*, 358 F.3d at 661.

25        Finally, if any aspect of Plaintiffs' claims survive, Lilly would nevertheless be

26  entitled to summary judgment on their punitive damages claim.

27

28

## II.   SUMMARY OF UNDISPUTED FACTS

### A.   Ms. Herrera's history of treatment-resistant depression and anxiety

Ms. Herrera has confronted significant emotional and psychiatric difficulties in her lifetime.   Around age 12, she developed trichotillomania, a compulsive and chronic disorder that led her to pull out her hair.   (Herrera Dep. at 96:7-14, 162:19 - 163:9; Hutton Recs. at 26-27).   A few years later, when she was fifteen, Ms. Herrera's father died, leaving seven children and a widow.   (Hutton Recs. at 26).   Ms. Herrera soon left school for a series of clerical jobs, despite her longstanding dream of becoming a police helicopter pilot.   (Herrera Dep. at 13:4-8; Hutton Recs. at 26).

Ms. Herrera first sought help for depression in 2000, around age 31, and began a series of unsuccessful treatments.   She tried Wellbutrin, but it did not work for her, and she found it damaging to her libido.   (Hutton Recs. at 27; CVS Recs. at 12).   She next tried Zoloft, but again discontinued it after it failed to relieve her depression and caused unwanted side effects.   (Hutton Recs. at 27; CVS Recs. at 12).   Around 2006 or 2007, Ms. Herrera suffered a recurrence of her depression, coupled with anxiety that hampered her ability to work.   (Herrera Dep. at 105:20-23, 108:21 - 110:12). Feeling "tired, struggling . . . [and] sad," she sought treatment from Dr. Braunstein. (*Id.* at 106:12-107:11).   Dr. Braunstein recalled that when he first saw Ms. Herrera, she was in "emotional distress" and "distraught."   (Braunstein Dep. at 45:15-16, 112:3-7).   He prescribed Wellbutrin, but it failed to relieve Ms. Herrera's symptoms. (Herrera Dep. at 107:18-22; Michael's Recs. at 11).   Faced with Ms. Herrera's treatment-resistant depression, Dr. Braunstein turned to Cymbalta.   Ms. Herrera began taking Cymbalta, and her depression and anxiety improved within a month.   (Herrera Dep. at 108:1-4, 196:13-24; Michael's Recs. at 11).

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT
PURSUANT TO FED. R. CIV. P. 56(a)

**B.   Dr. Braunstein's understanding of the risk of antidepressant discontinuation**

By the time he prescribed Cymbalta for Ms. Herrera, Dr. Braunstein had a longstanding appreciation of antidepressant discontinuation symptoms generally, as well as significant experience with Cymbalta in particular.

Dr. Braunstein became aware of the risk of antidepressant discontinuation syndrome during his medical training in the 1980s and 1990s, when he was exposed to patients on antidepressants "every day."   (Braunstein Dep. at 104:1-5, 106:14 - 107:10).  In explaining his observations of this phenomenon, he starkly recounted:  "It was terrible.  Everybody experienced them.  It was awful. . . . [A]ll the drugs were awful, because not only did the -- was there a withdrawal symptom from virtually everything that we used, but then the re-emergence of the symptoms that had hardly been treated in the first place -- it was very ugly." (*Id*. at 108:24 - 109:10).

After completing his medical training, Dr. Braunstein gained significant first-hand experience treating antidepressant discontinuation symptoms in private practice, where approximately 50 to 60 percent of his patients suffer from psychiatric conditions and many take antidepressants. (*Id*. at 23:9-20, 25:21-26:2).  For "virtually every anti-depressant" he has prescribed, patients have reported "some combination" of discontinuation symptoms, including dysphoric mood, irritability, agitation, dizziness, paresthesias, anxiety, confusion, headache, lethargy, emotional lability, insomnia, hypomania, tinnitus, and seizures. (*Id*. at 139:6 - 140:18).  Not all reported symptoms are necessarily caused by discontinuation, as "[t]he problem with these drugs and psychiatry is the patients are so complex -- that their baseline level of function is so dysfunctional sometimes you don't even know whether it's a side effect of the drug as you withdraw or the emergence of an underlying personality trait or way of coping -- a dysfunctional way they cope[.]" (*Id*. at 62:21 - 63:2).

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

1       Dr. Braunstein also developed deep familiarity with the benefits and risks of

2   Cymbalta, which he described as "one of the most effective best anti-depressants[.]"

3   (*Id.* at 42:13-19).   He has cared for "hundreds [of patients] over time" taking

4   Cymbalta, including at least fifty patients before prescribing it for Ms. Herrera.  (*Id.* at

5   41:13-14, 117:20 - 118:2).

6       When Dr. Braunstein first prescribed Cymbalta for Ms. Herrera around March

7   2007, both the *Precautions* and *Dosage and Administration* sections of the label

8   included detailed statements about discontinuation symptoms.   The *Precautions*

9   section contained a three-paragraph discussion of specific symptoms, their duration

10  and severity, and discontinuation methods.  It read:

11      Discontinuation     of     Treatment     With     Cymbalta.
    Discontinuation  symptoms  have  been  systematically

12  evaluated  in  patients  taking  Cymbalta.  Following  abrupt
    discontinuation in placebo-controlled clinical trials of up to

13  10-weeks duration, the following symptoms occurred at a
    rate greater than or equal to 2% and at a significantly higher

14  rate in either the MDD or GAD Cymbalta-treated patients
    compared to those discontinuing from placebo: dizziness;

15  nausea; headache; paresthesia; vomiting; irritability; and
    nightmare.

16

17  During marketing of other SSRIs and SNRIs (serotonin and
    norepinephrine  reuptake  inhibitors),  there  have  been

18  spontaneous  reports  of  adverse  events  occurring  upon
    discontinuation of these drugs, particularly when abrupt,

19  including  the  following:  dysphoric  mood,  irritability,
    agitation, dizziness, sensory disturbances (e.g., paresthesias

20  such as electric shock sensations), anxiety, confusion,
    headache,   lethargy,   emotional   lability,   insomnia,

21  hypomania, tinnitus, and seizures. Although these events are
    generally self-limiting, some have been reported to be

22  severe.

23  Patients should be monitored for these symptoms when
    discontinuing treatment with Cymbalta. A gradual reduction

24  in  the  dose  rather  than  abrupt  cessation  is  recommended
    whenever possible. If intolerable symptoms occur following

25  a decrease in the dose or upon discontinuation of treatment,
    then  resuming  the  previously  prescribed  dose  may  be

26  considered.   Subsequently,  the  physician  may  continue
    decreasing  the  dose  but  at  a  more  gradual  rate  (*see*

27

28

NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT
PURSUANT TO FED. R. CIV. P. 56(a)

DOSAGE AND ADMINISTRATION).    (March 2007 Cymbalta label).[1]

The *Dosage and Administration* section also discussed discontinuation symptoms, along with recommending dose tapering and patient monitoring:

> Discontinuing Cymbalta
> Symptoms associated with discontinuation of Cymbalta and other SSRIs and SNRIs have been reported (*see* PRECAUTIONS). Patients should be monitored for these symptoms when discontinuing treatment. A gradual reduction in the dose rather than abrupt cessation is recommended whenever possible. If intolerable symptoms occur following a decrease in the dose or upon discontinuation of treatment, then resuming the previously prescribed dose may be considered. Subsequently, the physician may continue decreasing the dose but at a more gradual rate. (*Id.*).

Lilly had already published the discontinuation data that led to the label's language several years before Ms. Herrera's 2007 Cymbalta prescription. A 2005 article co-authored by Lilly physician Dr. David Perahia in the peer-reviewed Journal of Affective Disorders reported that, across six short-term Cymbalta clinical trials studying patients with Major Depressive Disorder, 44.3% of Cymbalta patients had reported one or more discontinuation-emergent events after abruptly discontinuing the medicine, as compared to 22.9% of placebo patients. *See Symptoms following abrupt discontinuation of duloxetine treatment in patients with major depressive disorder*, 89 J. of Affective Disorders 207 (2005) ("2005 JAD Article").

Dr. Braunstein testified that data presented in the 2005 JAD Article neither substantially altered his understanding of Cymbalta's discontinuation profile nor impacted the likelihood he would prescribe Cymbalta:

> **Q.** [A]ssuming that what I've showed to you is an accurate number, 44 to 50 percent, does that change your understanding of the withdrawal profile for Cymbalta as we sit here today?

---

[1] In May 2007, the Cymbalta label began using a 1% rate threshold for reporting discontinuation symptoms, rather than a 2% threshold.

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

. . .
A.  Well, in my personal experience, ***I would have to say not that much***. . . . [I]t ***wouldn't cause me to hesitate prescribing it*** if I knew that it was a 50 percent chance even . . ."
(Braunstein Dep. at 85:20 - 86:15) (emphasis added).

Dr. Braunstein testified that the rate of discontinuation symptoms discussed in the 2005 JAD Article should be interpreted as "24 percent higher than placebo, because that gives you a true picture of what's happening; not that it's 45%, but it's 24% higher than placebo." (*Id.* at 160:20-24).[2]  These treatment and placebo statistics were "not unusual for any medicine" and they suggest "nothing that would seem alarming to [him]." (*Id.* at 145:17-24).

Dr. Braunstein also understood that the "1%" or "2%" language in the Cymbalta label was a threshold reporting level and should not be read to suggest that only one or two percent of patients experienced discontinuation symptoms.  (*Id.* at 137:19-25).  In fact, Dr. Braunstein believed that approximately "30, 40 percent" of Cymbalta patients experience discontinuation symptoms, "if you don't do it properly." (*Id.* at 33:14-16).  "I was aware that these symptoms were common.  That's why I told all the patients not to ever stop it suddenly, because these things will happen." (*Id.* at 163:10-13).

Given his understanding that patients commonly experienced discontinuation symptoms when stopping Cymbalta, Dr. Braunstein routinely advised patients to taper off the medicine:  "I knew there were a significant number of people that did have unpleasant withdrawal symptoms . . . .  I always warn people not to stop the medicine suddenly, that we have to taper it . . . [T]hat's a routine thing I tell every patient on

_____

[2] This testimony is consistent with the opinions proffered by Lilly's psychiatry expert, Dr. Douglas Jacobs.  *See* Jacobs Rep., Sept. 22, 2014, at 28 ("But it would be misleading to suggest that this 44% statistic reflects the actual frequency of discontinuation symptoms in Cymbalta-treated patients . . . .  The crucial information to be gleaned from the 44% versus 23% statistics is that discontinuation symptoms occur more frequently in Cymbalta-treated patients than placebo treated patients.").

NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT
PURSUANT TO FED. R. CIV. P. 56(a)

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

1   Cymbalta[.]"  (*Id.* at 73:19 - 74:3).  Tapered dosing was a "basic psychopharmacology

2   101" tactic that Dr. Braunstein understood long before Cymbalta was approved by the

3   FDA in 2004.  (*Id.* at 131:12, 104:1-5).  Tapering before discontinuation is "basic

4   training in med school, your residency and psychiatry."  (*Id.* at 131:20-21).

5   ## C.    Ms. Herrera's discontinuation of Cymbalta

6   Ms. Herrera took Cymbalta for almost five years before deciding to end her

7   treatment in early 2012.  Sensing the reemergence of depression and anxiety coupled

8   with weight gain and fatigue, "a bulb went off in [her] head and told [her] it's time to

9   get off any drugs."  (Herrera Dep. at 84:13-19).  She asked pulmonologist Dr. Mayur

10  Patel to help her discontinue Cymbalta.  (*Id.* at 79:18-20, 84:20-21).  Consistent with

11  the label, practice guidelines, and his standard approach, Dr. Patel first prescribed Ms.

12  Herrera a reduced 30 mg dose.  (Patel Dep. at 86:8-11, 87:23 - 89:7).  Despite Dr.

13  Patel's testimony that after three weeks Ms. Herrera "needed to come in between for

14  an appointment. . . . not do this herself," Ms. Herrera "cancelled the appointment" and

15  decided on her own to stop the medication altogether.  (*Id.* at 52:14 - 53:9; 82:13 -

16  83:3; 84:6-13).

17  When Ms. Herrera ultimately did go to see Dr. Patel on March 13, 2012, she

18  complained of depression, anxiety, insomnia, nausea, and diarrhea.  (*Id.* at 26:5 -

19  27:10; Patel-19).  Although Ms. Herrera now alleges symptoms including "zaps of

20  electricity," "suicidal ideation," and "uncontrollable muscle spasms," (Compl. ¶36)

21  Dr. Patel's records contain no references to these complaints, nor did he have any

22  recollection of Ms. Herrera sharing these symptoms.  (Patel Dep. at 38:6 - 45:9).

23  When Ms. Herrera complained again several weeks later, Dr. Patel prescribed 30 mg

24  of Cymbalta with the goal of alleviating her symptoms and possibly tapering her more

25  slowly.  (*Id.* at 84:23 - 85:12, 87:15-20; Michael's Recs at 16; Patel-19).  Ms. Herrera

26  refused the medication and did not return to Dr. Patel's office for one year.  (Herrera

27  Dep. at 264:16-19; Patel Dep. at 85:22 - 86:1).  She admits that she did not seek

28

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT
PURSUANT TO FED. R. CIV. P. 56(a)

1   medical attention for discontinuation symptoms in the year after she tapered off

2   Cymbalta, and that she is not currently seeking care from any medical professional.

3   (Herrera Dep. at 265:22-266:2, 274:3-6, 286:8-9).

4   **III.   ARGUMENT**

5        Summary judgment is appropriate when there is "no genuine dispute as to any

6   material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ.

7   P. 56(a).  "Where the non-moving party bears the burden of proof at trial, the moving

8   party need only prove that there is an absence of evidence to support the non-moving

9   party's case."  *In re Oracle Corp. Secs. Litig.*, 627 F. 3d 376, 387 (9th Cir. 2010).

10  Once a party seeking summary judgment has made a sufficient showing, the non-

11  moving party must set forth specific facts showing that a genuine issue of material fact

12  exists.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).  This requires more than

13  "[t]he mere existence of a scintilla of evidence."  *Anderson v. Liberty Lobby, Inc.*, 477

14  U.S. 242, 252 (1986).  Summary judgment is appropriate when "the record taken as a

15  whole could not lead a rational trier of fact to find for the non-moving party."

16  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 584 (1986).

17       In this failure-to-warn case, Ms. Herrera must show not only that Lilly failed to

18  provide an adequate warning, but also that "the inadequacy or absence of the warning

19  caused the plaintiff's injury."  *Motus I*, 196 F. Supp. 2d at 991 (citing *Plummer v.*

20  *Lederle Labs.*, 819 F.2d 349, 358 (2d. Cir. 1987) (applying California law); *see also*

21  *Saavedra v. Eli Lilly & Co.*, 2013 U.S. Dist. LEXIS 90481, *13 (C.D. Cal. June 13,

22  2013) ("However, even if this Court, or a fact-finder, concludes that the warnings give

23  were inadequate, Plaintiffs would still be required to prove that 'the inadequacy or

24  absence of the warning caused the plaintiff's injury.'") (citing *Motus*); *Tucker v.*

25  *Wright Med. Tech., Inc.*, 2013 U.S. Dist. LEXIS 38354 (N.D. Cal. Mar. 19, 2013).

26  Under well-established California law, a pharmaceutical manufacturer's duty to warn

27  about the risks of a prescription medication "runs to the physician, not to the patient."

28

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

*Motus I*, 196 F. Supp. 2d at 990-91 (internal quotation marks omitted); *see also
Thomas v. Abbott Labs.*, 2014 U.S. Dist. LEXIS 109905 at *13-14 (C.D. Cal. July 29,
2014); *Carlin v. Super. Ct.*, 920 P.2d 1347, 1354 (Cal. 1996); *Saavedra*, 2013 U.S.
Dist. LEXIS 90481 at *7 & n.3 (holding that the learned intermediary doctrine applies
to claims by California plaintiffs) (citing *Carlin*).

Summary judgment is appropriate here because Ms. Herrera cannot establish
proximate cause.  Two distinct grounds support this conclusion.  <u>First</u>, Dr. Braunstein
had independent knowledge about the risk of discontinuation symptoms.  <u>Second</u>, Dr.
Braunstein's own testimony establishes that he would have prescribed Cymbalta to
Ms. Herrera even if its label contained precisely the information plaintiffs allege
should be included.  Either of these is sufficient to break the chain of causation under
California law, and failure to establish proximate cause is a stand-alone basis for
granting summary judgment.  And even if any aspect of Plaintiffs' claims were to
survive, Lilly would be entitled to summary judgment on their claims for punitive
damages.

A.      **Dr. Braunstein independently understood Cymbalta's
discontinuation risks.**

Dr. Braunstein's testimony – which demonstrates that he had independent
knowledge of the risk of antidepressant discontinuation symptoms, the specific
symptoms associated with discontinuation, and the potential frequency of events – is
fatal to Ms. Herrera's claims under California law, where "the adequacy of the
warnings is immaterial where the doctor knows of the specific risks." *Huntman*, 1998
U.S. Dist. LEXIS 13431 at *20.  In *Huntman*, the court granted summary judgment
for the defendant when the doctor testified that he was aware of the relevant risks
based on his experience and independent research.  *Id*. at *17, 27. Similarly, in
*Rosburg*,  the Court of Appeals affirmed judgment for the defendant after noting that
"plaintiff's physician already knew of the [alleged] danger."  As such, "no harm could

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT
PURSUANT TO FED. R. CIV. P. 56(a)

1   have been caused by failure to warn of a risk already known."  181 Cal. App. 3d at

2   735-36.  When a risk is known, then "failure to warn the physician of that risk cannot

3   be the legal cause" of the alleged harm.  *Plenger v. Alza Corp.*, 11 Cal. App. 4th 349,

4   362 (1992) (citing *Kirsch v. Picker Int'l, Inc.*, 753 F.2d 670, 671-72 (8th Cir. 1985)).

5   This standard is common, with many other courts coming to the same conclusion.[3]

6       It is undisputed that Dr. Braunstein was aware of the risks of antidepressant

7   discontinuation symptoms long before he prescribed Cymbalta to Ms. Herrera.  He

8   learned about discontinuation symptoms as part of his medical education, where he

9   discovered first-hand that there was "a withdrawal symptom from virtually everything

10  that we used."  (Braunstein Dep. at 108:24 - 109:8).  In his private practice, which

11  focuses on patients with psychiatric conditions, Dr. Braunstein has witnessed "some

12  combination" of discontinuation symptoms explicitly listed in the Cymbalta label

13  "with virtually every anti-depressant" he has prescribed.  (*Id.* at 139:6 - 140:14; 23:9-

14  20).  To reduce the chance of discontinuation symptoms Dr. Braunstein tapered

15  patients' antidepressant doses:

> **Q.**  How did you learn that [tapering] needed to be the
> course of . . . .
> **A.**  Oh, when I was in training.  ***That was basic -- basic
> psychopharmacology 101*** or whatever. . . . ***It's part of your
> basic training in med school, your residency and
> psychiatry***."

19  (*Id.* at 131:3-21) (emphasis added).

20      Dr. Braunstein also understood how to read the discontinuation risk language in

21  the Cymbalta label:

---

[3] *See, e.g.*, *Porterfield v. Ethicon*, Inc., 183 F.3d 464, 468 (5th Cir. 1999) ("Because Porterfield's surgeon was aware of the possible risks of using the mesh but decided to use it anyway, the inadequate warning was not a producing cause of Porterfield's injury."); *Odom v. G.D. Searle & Co.*, 979 F.2d 1001, 1003 (4th Cir. 1992) ("[T]he manufacturer cannot be said to have caused the injury if the doctor already knew of the medical risk."); *Kirsch*, 753 F.2d at 671 ("Picker's failure to warn Dr. Murphy could not have been the proximate cause of Kirsch's injury if Murphy was already aware of the cancer risks associated with radiation therapy."); *Felix v. Hoffmann-La Roche, Inc.*, 540 So. 2d 102, 105 (Fla. 1989) (no proximate cause where physician had prior knowledge of risk at issue).

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

**Q:** Now does that [language in the Cymbalta *Precautions* section] mean to you that there's only a 1 percent chance that a patient might develop discontinuation symptoms?

. . .

**A:** Well, ***it means exactly what it says***, that it could be ***equal to [a] 1 percent rate or much higher*** . . ."

(*Id*. at 137:19-25) (emphasis added).

This accurate and common-sense interpretation stands in stark contrast to Plaintiffs' unsupported central claim that Lilly misled medical professionals about the rate of discontinuation symptoms by using a 1% threshold in its label.[4]  To be clear, Plaintiffs' theory is legally deficient to establish liability – but it is also inapplicable here, where Ms. Herrera's prescriber has unequivocally testified that he was not misled as suggested by Plaintiffs.

When he prescribed Cymbalta for Ms. Herrera in 2007, Dr. Braunstein "knew that there were a significant number of people that did have unpleasant withdrawal symptoms[.]"  (*Id*. at 73:11-21).  As he explained:  "I was aware that these symptoms were common.  That's why I told all the patients not to ever stop it suddenly . . . ."  (*Id*. at 163:10-12).  Specific data showing that 44 percent of patients experienced discontinuation symptoms "wouldn't have affected [his] use of the drug" and did not materially alter his understanding of Cymbalta's discontinuation profile.  (*Id*. at 82:4-5; 85:18 - 86:2).  Dr. Braunstein's testimony demonstrates there is no causal link between the alleged inadequacies of Lilly's warning and Plaintiff's injury.  Here,

---

[4] Compare Dr. Braunstein's straightforward understanding of the Cymbalta label to the claim by Plaintiffs' expert Dr. Joseph Glenmullen that "[y]ou know, the 1 percent jumps out at you in that first paragraph, and it's grossly misleading," (Glenmullen Dep. at 186:16-18), and his opinion that "Lilly's misleading information make it *impossible* for any patient or physician to make an informed decision about the appropriateness of taking or prescribing Cymbalta."  (Glenmullen Rep. at 2, Sept. 22, 2014) (emphasis added).  He offers these colorful conclusions while acknowledging that he neither read Dr. Braunstein's testimony nor otherwise conducted any studies or surveys of physicians to assess their knowledge of discontinuation symptoms or view of the Cymbalta label.  (Glenmullen Dep. at 59:3-8, 76:17-25, 168:25 - 169:18).  When a paid expert so cavalierly ignores actual evidence in the case to advocate for a legal position, a court can rightly ignore his views.

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

1   "plaintiff's physician already knew of the danger" and as a result, "no harm could

2   have been caused by failure to warn of a risk already known." *Rosburg*, 181 Cal.

3   App. 3d at 735.  Put simply, "no one needs notice of that which he already knows."

4   *Plummer,* 819 F.2d at 359 (citation and quotation marks omitted).

5       Two federal courts in nearly identical Cymbalta discontinuation cases have

6   reached this precise conclusion.   In *Carnes*, the court held that a prescriber's

7   independent knowledge of potential Cymbalta discontinuation symptoms made it

8   impossible for the plaintiffs to establish proximate cause. *See* 2013 U.S. Dist. LEXIS

9   176201 at *19.  In *McDowell*, the court granted summary judgment on proximate

10  cause grounds where the prescriber testified that she "had knowledge of the risks of

11  abrupt discontinuation . . . and that she was not misled by the discontinua[tion]

12  warning claim." *See* 2014 U.S. Dist. LEXIS 157819 at *40, *48.

13      Here, Dr. Braunstein's unequivocal testimony demonstrates that he had

14  independent knowledge about Cymbalta discontinuation risks and was not misled.  As

15  such, Plaintiffs cannot establish that any alleged inadequacies in Cymbalta's label

16  proximately cause Ms. Herrera's injuries, and, thus, Lilly is entitled to summary

17  judgment.

18      **B.    Plaintiffs' preferred warning would not have changed**

19          **Dr. Braunstein's prescribing decision.**

20      There is another distinct and independent factual basis for concluding that

21  Plaintiffs cannot establish proximate cause:  Dr. Braunstein testified that a different

22  discontinuation warning would not have changed his prescribing decision.

23      A bedrock principle of California's product liability law holds that plaintiffs

24  bear the burden of demonstrating that "the additional non-disclosed risk was

25  sufficiently high that it would have changed the treating physician's decision to

26  prescribe the product for the plaintiff." *Motus I*, 196 F. Supp. 2d at 995-96.  Indeed, a

27  claim based on allegedly insufficient warnings "cannot survive summary judgment if

28

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT
PURSUANT TO FED. R. CIV. P. 56(a)

stronger warnings would not have altered the conduct of the prescribing physician."
*Motus II*, 358 F.3d at 661; *see also Tucker*, 2013 U.S. LEXIS 38354 at *41, *51
(granting summary judgment under the *Motus* standard); *Misouria v. Eli Lilly & Co.*,
2009 U.S. Dist. LEXIS 57215, at *59-60, *62 (E.D.N.Y. June 24, 2009) (granting
summary judgment where  "Plaintiff has presented no evidence that her original
Zyprexa-prescribing physician, Dr. Deignan, would have recommended and
prescribed a drug instead of Zyprexa had defendant provided an alternative warning.")
(applying California law), *aff'd*, 394 F. App'x 825, 827 (2d Cir. 2010); *In re: Zyprexa
Prods. Liab. Litig. (Neal v. Eli Lilly & Co.*), 2009 U.S. Dist. LEXIS 57218, at *59-62
(E.D.N.Y. June 22, 2009) (granting summary judgment where there was "no evidence
that any of plaintiff's treating psychiatrists would have altered their decision to
prescribe Zyprexa to plaintiff had a different warning been provided by Lilly.")
(applying California law), *aff'd*, 394 F. App'x 823, 825 (2d Cir. 2010); *Gaghan v.
Hoffman-LaRoche Inc.,* 2014 N.J. Super. Unpub. LEXIS 1895, *39 (App. Div. Aug. 4,
2014) (per curiam) (reversing plaintiff's verdict where "Gaghan failed to prove that
Dr. Hartman would have altered his decision to recommend and prescribe Accutane
for her severe scarring acne that could not be adequately treated with other
medications.") (applying California law).  Courts across the country have applied the
same standard, including the *McDowell* and *Carnes* courts when granting summary
judgment in parallel Cymbalta discontinuation cases.[5]    Given Dr. Braunstein's
testimony, the same ruling is warranted here.

---

[5] *See McDowell*, 2014 U.S. Dist. LEXIS 157819 at *41-46 (applying New York law);
*Carnes*, 2013 U.S. Dist. LEXIS 176201 at *19, *23 (applying South Carolina law).
*See also Wheat v. Pfizer, Inc.*, 31 F.3d 340, 343 (5th Cir. 1994) ("Plaintiffs must
demonstrate that '. . . but for the inadequate warning, the treating physician would not
have used or prescribed the product.'") (internal quotation marks and citation
omitted)); *Hoffman-La Roche Inc. v. Mason*, 27 So. 3d 75, 76 (Fla. Dist. Ct. App.
2009) (per curiam) ("Because Appellee presented no evidence from either treating
physician that a differently worded warning would have resulted in either physician
not prescribing Accutane for his extreme acne, Appellee failed to establish that the
(continued…)

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT
PURSUANT TO FED. R. CIV. P. 56(a)

Dr. Braunstein testified that a different warning – one containing the exact information Plaintiffs contend was missing from the Cymbalta label – would not have changed his decision to prescribe Cymbalta for Ms. Herrera:

> "**Q**.   If the prescribing information for Cymbalta had included that . . . 44 percent of Cymbalta patients had symptoms, 22 percent of placebo patients had symptoms, and in light of Ms. Herrera's presentation at the time with depression and anxiety disorders and your experience with anti-depressants and your understanding of the potential risk of alternatives to Cymbalta, would the inclusion of that data have changed your prescribing decision at all?
> **A**.  *I don't think so. . . .  -No*.  I doubt it.  The only thing that I would tell them is that whoever --  make sure that if it's not me, somebody else that knows how to do -- has experience taking people off Cymbalta doesn't just do it the way they want to do it.  They should have experience with it.
> **Q**.  But it wouldn't have changed your prescribing decision?
> **A**.  *No*."

(Braunstein Dep. at 167:13 - 168:8) (emphasis added).

Even when questioned by Plaintiffs' counsel, Dr. Braunstein reiterated that their suggested labeling "wouldn't cause [him] to hesitate prescribing" Cymbalta.  (*Id.* at 86:13-15).  In fact, Dr. Braunstein would prescribe Cymbalta even if he knew there was "a 50 percent chance" of discontinuation symptoms.  (*Id.*).  Because Plaintiffs cannot demonstrate that a different warning would have changed Dr. Braunstein's prescribing decision, summary judgment is appropriate.  *Motus II*, 358 F.3d at 661.

## C.   Ms. Herrera's failure-to-warn claims subsume her remaining claims.

Plaintiffs' assorted tag-along claims also fail, as all are "premised to some extent on the allegation [that defendant's] failure to warn caused her injuries."  *Motus I*, 196 F. Supp. at 999 (granting summary judgment on negligence, strict liability,

---

allegedly deficient warning was the proximate cause of his injury therefore, we reverse."); *Sager v. Hoffman-La Roche, Inc.*, 2012 WL 3166630, at *17-18 (N.J. Super. Ct. App. Div. Aug. 7, 2012) (Florida law) (per curiam) (finding no proximate cause where prescribing physicians testified that they still would have prescribed acne medicine if defendant had provided a stronger product warning); *Ralston v. Smith & Nephew Richards, Inc.*, 275 F.3d 965, 976-77 (10th Cir. 2001) (Kansas law) (no causation where evidence showed a different warning "would have made no difference in Dr. Bohn's decision").

NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT
PURSUANT TO FED. R. CIV. P. 56(a)

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

1   fraud, and warranty claims); *see also Latiolais v. Merck & Co.*, 2007 U.S. Dist.

2   LEXIS 101857, *11 n.1 (C.D. Cal. Feb. 6, 2007) ("[A]ny fact negating causation in

3   the failure to warn context will be dispositive of both the negligence and strict liability

4   claims."); *Huntman*, 1998 U.S. Dist. LEXIS 13431 at *15-19 (granting summary

5   judgment on failure to warn, fraud, and warranty claims).[6]

6   Plaintiffs' claim under the California Unfair Competition Law ("UCL") also

7   fails. Because the UCL simply "borrows violations of other laws . . . and makes those

8   unlawful practices actionable under the UCL," Plaintiffs must raise genuine issues of

9   material fact on the underlying allegations as a necessary predicate to maintain a UCL

10  claim. *Lazar v. Hertz Corp.*, 69 Cal. App. 4th 1494, 1505 (1999). Plaintiffs cannot

11  clear this hurdle, and summary judgment on the UCL claim is appropriate. *See*

12  *nSight, Inc. v. PeopleSoft, Inc.*, 296 F. App'x 555, 561 (9th Cir. 2008) (because a UCL

13  claim was "derivative of nSight's other state law claims, summary judgment on this

14  claim was correct").

15  Mr. Lowry's loss of consortium claim is similarly dependent on a successful

16  claim for tortious injury to a spouse. *See Gonzalez v. United States*, 2011 U.S. Dist.

17  LEXIS 107455, at *19 (E.D. Cal. Sept. 21, 2011) ("[S]ince [plaintiff] has no cause of

18  action in tort[,] his spouse has no cause of action for loss of consortium." (internal

19  quotation marks and citation omitted)). Because Ms. Herrera's claims have failed,

20  summary judgment is appropriate on Mr. Lowry's loss of consortium claim.

21

22

23

24  [6] *See* Compl. ¶¶44-50 (Negligence), ¶¶51-62 (Strict Product Liability- Design Defect),
    ¶¶63-77 (Strict Product Liability - Failure to Warn); ¶¶78-90 (Strict Product Liability),
25  ¶¶91-100 (Negligent Misrepresentation), ¶¶101-09 (Fraud), ¶¶110-16 (Breach of
    Implied Warranty), ¶117-123 (Unlawful, unfair, and fraudulent business practices),
26  ¶¶124-27 (loss of consortium). California law unequivocally prohibits strict liability
    claims for design defect against manufacturers of prescription medicines. *See Brown*
27  *v. Super. Ct. of the City & Cnty. of S.F.*, 44 Cal. 3d 1049, 1069 (1988).

28

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

**D.      The record does not support Ms. Herrera's punitive damages claim.**

Even if some aspect of Plaintiffs' claims survive, Plaintiffs cannot clear the high bar required for punitive damages, which are generally "disfavored by the law," *Altman v. PNC Mortg.*, 850 F. Supp. 2d 1057, 1086 (E.D. Cal. 2012), and reserved for cases where "clear and convincing" evidence demonstrates that the defendant is guilty of "oppression, fraud, or malice."  Cal. Civ. Code § 3294(a).  Because facts on summary judgment are evaluated "through the prism of the substantive evidentiary burden," then in cases where the "clear and convincing" standard applies, the summary judgment inquiry will focus on  "whether the evidence presented is such that a jury applying that evidentiary standard could reasonably find for either the plaintiff or the defendant."  *Anderson*, 477 U.S. at 255.  In essence, to defeat summary judgment the plaintiff must come forward with "evidence from which a jury might return a verdict in his favor." *Anderson*, 477 U.S. at 257.

Plaintiffs cannot meet this burden.  As a threshold matter, claims for punitive damages are unfounded where a manufacturer warns of the potential risk that resulted in the plaintiff's injury, even though that warning might subsequently be determined to be inadequate.  *See Heston v. Taser Int'l., Inc.*, 431 Fed. Appx. 586, 589 (9th Cir. 2011) (upholding a decision to vacate a punitive damages award where "TASER made efforts, albeit insufficiently, to warn its customers about the risks posed by prolonged TASER deployment").  While an inadequate warning "may amount to negligence, it does not rise to the level 'willful or wanton' conduct" required to support punitive damages.  *Id.*  This standard is commonly applied by many courts.  *See Salvio v. Amgen Inc.*, 2012 U.S. Dist. LEXIS 19009, *24-25 (W.D. Pa. Feb. 15, 2012) (granting motion to dismiss punitive damages claim where the pharmaceutical label "warned of . . . the very injury that allegedly caused Decedent's death," so that *even if Plaintiff could show that more could have been done or said*, the Defendants did not display indifference toward the public's safety") (emphasis added) (Pennsylvania law); *Toole*

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

1  *v. Baxter Healthcare Corp.*, 235 F.3d 1307, 1317 (11th. Cir. 2000) ("[T]he issue of

2  punitive damages should not go to the jury when a manufacturer takes steps to warn

3  the plaintiff of the potential danger that injured him; such acts bar a finding of

4  wantonness.") (Alabama law);   *Bhagvandoss v. Beiersdorf, Inc.*, 723 S.W.2d 392,

5  398-99 (Mo. 1987) (en banc) (reversing a finding of punitive damages in a failure to

6  warn case involving bandages, noting that "[i]nadequate communication cannot be

7  equated to conscious disregard" of patient safety, and that "there is no showing that

8  the appellant concealed anything from the FDA, or failed to cooperate.") (Missouri

9  law);   *Dudley v. Bungee Int'l Mfg. Corp.*, 1996 U.S. App. LEXIS 1267, *11 (4th Cir.

10  Jan. 31, 1996) (reversing finding on punitive damages where "[defendant] warned of

11  the potential danger that injured [plaintiff]" and thus "an award of punitive damages

12  was not warranted under a failure to warn theory") (Virginia law); *De Luryea v.

13  Winthrop Laboratories*, 697 F.2d 222, 231 (8th Cir. 1983) (upholding district court's

14  dismissal of punitive damages claim even in the face of inadequate warning because

15  "there was no evidence to support punitive damages") (Arkansas law).

16      Punitive damages are therefore not appropriate here, where Lilly explicitly

17  warned about the risk of Cymbalta discontinuation symptoms.  The Cymbalta label

18  has always included a warning about the risk of discontinuation symptoms, a list of

19  symptoms that occurred at or above a threshold frequency in clinical trials, and advice

20  on discontinuing the medication.  To be sure, Plaintiffs and their experts quibble with

21  how Lilly describes this risk in the Cymbalta label, but they rest their critique on the

22  data presented in the ***publically available*** Perahia article, which in turn summarized

23  the various studies submitted to FDA and other regulators for the approval of

24  Cymbalta.  *See* Compl. ¶19.   In these circumstances, where the Cymbalta label

25  contains an extensive warning about the precise risk alleged and where Plaintiffs point

26  to Lilly's own published article to support their claim, Plaintiffs cannot as a matter of

27  law demonstrate that Lilly acted with the requisite level of oppression, fraud, or

28

NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT
PURSUANT TO FED. R. CIV. P. 56(a)

1   malice to support a punitive damages award.  Indeed, Plaintiffs' principal regulatory

2   expert Louis Morris conceded that he "[did] not have any -- any sense that they [Lilly]

3   were trying to hide information" (Morris Dep. 184:2-3).  And Plaintiffs' other expert,

4   Dr. Joseph Glenmullen, could support his assertion that Lilly acted improperly only

5   by pointing to the wording of the label itself, which in his view was so deficient as to

6   support an inference Lilly must have acted improperly.  (Glenmullen Dep. at 200:7-

7   14).  Such hollow, unsupported speculation about Lilly's intent would not even be

8   admissible, let alone sufficient to meet Plaintiffs' burden to overcome summary

9   judgment on punitive damages.  *See Matsushita*, 475 U.S. at 586 (party opposing

10  summary judgment "must do more than simply show that there is some metaphysical

11  doubt as to the material facts").

12      Because no reading of the record supports a claim of oppressive, fraudulent, or

13  malicious actions by Lilly, summary judgment is appropriate on Plaintiffs' punitive

14  damages claim.  *See Celotex*, 477 U.S. at 322.

15

16                              **CONCLUSION**

17      For the reasons set forth above, Lilly's motion for summary judgment should be

18  granted, and judgment should be entered in Lilly's favor as to all claims.

19  DATED: February 5, 2015                Respectfully Submitted,

20
                                            _____/s/ David E. Stanley_____
21                                          David E. Stanley
22                                          REED SMITH LLP

23                                          Michael X Imbroscio *(pro hac vice)*
24                                          Phyllis A. Jones *(pro hac vice)*
                                            Kathleen E. Paley *(pro hac vice)*
25                                          COVINGTON & BURLING LLP

26
                                            Attorneys for Defendant
27                                          ELI LILLY AND COMPANY

28

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

No. CV 13-02702-SVW-MAN                 – 19 –