David E. Stanley (SBN 144025)
REED SMITH LLP
355 South Grand Avenue, Suite 2900
Los Angeles, CA 90071-1514
Telephone: (213) 457-8000
Facsimile: (213) 457-8080
dstanley@reedsmith.com

Michael X. Imbroscio (pro hac vice)
Phyllis A. Jones (pro hac vice)
Kathleen E. Paley (pro hac vice)
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001
Telephone: (202) 662-5868
Facsimile: (202) 778-5868
mimbroscio@cov.com
pajones@cov.com
kpaley@cov.com

Attorneys for Defendant
Eli Lilly and Company

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CLAUDIA HERRERA and PETER LOWRY,<br><br>                    Plaintiffs,<br><br>     vs.<br><br>ELI LILLY AND COMPANY, an Indiana corporation,<br><br>                    Defendant. | No.: 2:13-cv-2702 SVW-MANx<br><br>**LILLY'S NOTICE OF MOTION AND MOTION TO EXCLUDE THE EXPERT TESTIMONY OF JOSEPH GLENMULLEN; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>Date:        April 6, 2015<br>Time:        1:30 PM<br>Location:    Courtroom 6<br>Judge:       Hon. Stephen V. Wilson |

## NOTICE OF MOTION

TO PLAINTIFFS AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on April 6, 2015, at 1:30 P.M. or as soon thereafter as the matter may be heard in Courtroom 6 of the United States District Court, Central District of California, Western District, located at 312 N. Spring Street, Los Angeles, California 90012, defendant Eli Lilly and Company will move the Court to exclude the proposed expert testimony of Joseph Glenmullen, proffered by Plaintiffs Claudia Herrera and Peter Lowry, under Federal Rule of Evidence 702.

The Motion will be based on this Notice of Motion and Motion, the Memorandum of Points and Authorities set forth below, and the Declaration of Kathleen E. Paley.

This motion is made following a conference of counsel pursuant to L.R. 7-3, which took place on February 25, 2015.


DATED:      March 4, 2015            Respectfully Submitted,


                                     /s/ David E. Stanley
                                     David E. Stanley
                                     REED SMITH LLP

                                     Michael X. Imbroscio (*pro hac vice*)
                                     Phyllis A. Jones (*pro hac vice*)
                                     Kathleen E. Paley (*pro hac vice*)
                                     COVINGTON & BURLING LLP

                                     Attorneys for Defendant
                                     ELI LILLY AND COMPANY

# TABLE OF CONTENTS

Page(s)

TABLE OF AUTHORITIES ........................................................................ ii

PRELIMINARY STATEMENT ...................................................................1

BACKGROUND ........................................................................................2

LEGAL STANDARD..................................................................................4

ARGUMENT..............................................................................................5

I.  Dr. Glenmullen's Testimony Should Be Excluded Because It Is Unreliable ..................................................................................5

    A.  Applicable Legal Standards Regarding Reliability............................5

    B.  Dr. Glenmullen's Opinions About How Physicians and Patients Read the Label and Comprehend the Risks Are Unreliable (Section 6) ....................................................................6

        1.  Dr. Glenmullen's  Opinions Are Methodologically Unsupported .....................................................................6

        2.  Training and Experience Do Not Confer Reliability on His Opinions .....................................................................10

        3.  Dr. Glenmullen Does Not Account for Contrary Findings...............................................................................12

        4.  Dr. Glenmullen's Opinions Are Driven by Litigation..............14

    C.  Dr. Glenmullen's Opinions About Lilly's Corporate Motives Are Baseless and Unreliable (Section 7)....................................15

    D.  Certain of Dr. Glenmullen's Other Opinions Are Also Methodologically Flawed and Unreliable (Sections 1 and 3)............19

II.  Dr. Glenmullen's Testimony Should Be Excluded Because It Will Not Assist the Trier of Fact (Sections 2 and 7) ............................21

III.  Dr. Glenmullen Is Unqualified to Render His Opinions...............................23

CONCLUSION........................................................................................25

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

MOTION TO EXCLUDE TESTIMONY OF GLENMULLEN UNDER FED. R. EVID. 702

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Abarca v. Franklin Cnty. Water Dist.*,
    761 F. Supp. 2d 1007 (E.D. Cal. 2011) ...................................................... 14

*Estate of Barabin v. AstenJohnson, Inc.*,
    740 F.3d 457 (9th Cir. 2014) ..................................................................... 4

*In re Bextra & Celebrex Mktg. Sales Practices & Prod. Liab. Litig.*,
    524 F. Supp. 2d 1166 (N.D. Cal. 2007) ........................................ 9, 20, 21

*Brighton Collectibles, Inc. v. Renaissance Grp. Int'l*,
    2008 WL 5500659 (S.D. Cal. May 13, 2008) ......................................... 21

*Brown v. Roche Labs., Inc.*,
    2013 WL 2457950 (N.D. Ga. June 6, 2013), *aff'd*, 567 F. App'x 860
    (11th Cir. 2014) ......................................................................................... 24

*In re C.R. Bard, Inc.*,
    948 F. Supp. 2d 589 (S.D. W. Va. 2013) ......................................... 22, 25

*Cabrera v. Cordis Corp.*,
    134 F.3d 1418 (9th Cir. 1998) .................................................................. 5

*Carnes v. Ely Lilly & Co.*,
    2013 WL 6622915 (D.S.C. Dec. 16, 2013) ............................................. 13

*Cloud v. Pfizer Inc.*,
    198 F. Supp. 2d 1118 (D. Ariz. 2001) ...................................................... 5

*Daubert v. Merrell Dow Pharm., Inc.*,
    43 F.3d 1311 (9th Cir. 1995) ...................................................... 4, 5, 6, 15

*Daubert v. Merrell Dow Pharm., Inc.*,
    509 U.S. 579 (1993) ................................................................................ 4, 6

*In re Fosamax Prods. Liab. Litig.*,
    645 F. Supp. 2d 164 (S.D.N.Y. 2009) ........................................ 18, 21, 22

*Kaufman v. Pfizer Pharm., Inc.*,
    2011 WL 7659333 (S.D. Fla. Aug. 4, 2011) ........................................... 18

*Kumho Tire Co. v. Carmichael*,
    526 U.S. 137 (1999) ................................................................................... 4

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

*Lust v. Merrell Dow Pharm., Inc.*,
    89 F.3d 594 (9th Cir. 1996) .............................................................. 13, 15

*Mason v. Smithkline Beecham Corp.*,
    2007 WL 924043 (C.D. Ill. Mar. 26, 2007) ........................................ 23

*McDowell v. Eli Lilly & Co.*,
    --- F. Supp. 3d. ---, 2014 WL 5801604 (S.D.N.Y. Nov. 7, 2014) .................... 12, 13

*McDowell v. Eli Lilly & Co.*,
    2015 WL 845720 (S.D.N.Y. Feb. 26, 2015) ............................... 12, 13, 21

*Miller v. Pfizer, Inc.*,
    196 F. Supp. 2d 1062 (D. Kan. 2002), *aff'd*, 356 F.3d 1326
    (10th Cir. 2004) .............................................................. 24, 25

*Motus v. Pfizer Inc.*,
    196 F. Supp. 2d 984 (C.D. Cal. 2001), *aff'd*, 358 F.3d 659 (9th Cir. 2004) ............ 2

*In re Nexium (Esomeprazole) Prods. Liab. Litig.*,
    2014 WL 5313871 (C.D. Cal. Sept. 30, 2014) ..................................... 6, 8

*Pfizer Inc. v. Teva Pharm. USA, Inc.*,
    461 F. Supp. 2d 271 (D.N.J. 2006) ................................................ 11

*In re Rezulin Prods. Liab. Litig.*,
    309 F. Supp. 2d 531 (S.D.N.Y. 2004) ......................................... *passim*

*Rhodes v. Bayer Healthcare Pharm., Inc.*,
    2013 WL 1289050 (W.D. La. Mar. 26, 2013) .................................. 24, 25

*Stanley v. Novartis Pharm. Corp.*,
    11 F. Supp. 3d 987 (C.D. Cal. 2014) ............................................ 5, 8

*In re Trasylol Prods. Liab. Litig.*,
    2010 WL 1489793 (S.D. Fla. Feb. 24, 2010) ...................................... 18

*In re Trasylol Prods. Liab. Litig.*,
    2010 WL 4052141 (S.D. Fla. May 12, 2010) ............................... 18, 19, 22

*In re Trasylol Prods. Liab. Litig.*,
    2011 WL 7109297 (S.D. Fla. Apr. 27, 2011) ................................... 24, 25

*In re Trasylol Prods. Liab. Litig.*,
    709 F. Supp. 2d 1323 (S.D. Fla. 2010) ...................................... 18, 19, 22

*Tyree v. Boston Scientific Corp.*,
    2014 WL 5320566 (S.D.W. Va. Oct. 29, 2014) ............................... 22, 24

**Rules**

Federal Rule of Evidence 702 ...................................................... *passim*

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

MOTION TO EXCLUDE TESTIMONY OF GLENMULLEN UNDER FED. R. EVID. 702

## MEMORANDUM OF POINTS AND AUTHORITIES

### PRELIMINARY STATEMENT

Under Federal Rule of Evidence 702, this Court should exclude the proposed testimony of Plaintiffs' expert, Dr. Joseph Glenmullen, that Lilly's Cymbalta label, by design, misrepresents the risks of discontinuing Cymbalta.  Dr. Glenmullen's opinions are merely his own musings, unsupported by any evidence, unmoored from any methodology, and unhelpful to the jury.  In short, his proposed testimony is inadmissible because it fails each prong of Rule 702's trilogy: reliability, relevance, and expertise.

*First*, Dr. Glenmullen's testimony is ***unreliable*** because it is not based on any data and is not the product of a reliable methodology—or any methodology at all.  Dr. Glenmullen opines that physicians invariably fail to deduce the frequency, severity, and duration of Cymbalta's discontinuation risks from Lilly's label because, in his view, Lilly intentionally crafted the label to obfuscate the risks.  Yet, he offers *no* support for this conjecture.  He has neither conducted nor cited any studies of physicians assessing their view of the Cymbalta label or their knowledge of discontinuation symptoms.  And he has no basis for opining on  Lilly's corporate intent.   His  groundless  speculation  about  the  Cymbalta  label,  Cymbalta's discontinuation risks, physicians' understanding of the label and the risks, and Lilly's motives cannot satisfy Rule 702.

*Second*, Dr. Glenmullen's testimony is ***irrelevant*** because it cannot assist the jury in understanding the case.  His testimony—that Lilly deliberately devised a misleading label—is unhelpful not only because it is speculative, but also because the jury does not need the help of an expert to evaluate corporate intent.

*Third*, Dr. Glenmullen's testimony is inadmissible because it does not implicate his specialized ***expertise***.  Although Dr. Glenmullen is a licensed psychiatrist, he does not have any regulatory or labeling experience, and he is not qualified to opine either on Lilly's corporate motives or on physicians' understanding of the Cymbalta label

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

MOTION TO EXCLUDE TESTIMONY OF GLENMULLEN UNDER FED. R. EVID. 702

and Cymbalta's discontinuation profile.  Rule 702 prohibits an expert from simply echoing the allegations of a complaint, especially when those opinions bear no nexus to the witness's purported expertise.

Lilly thus moves to exclude all of the opinions addressed in Sections 6 and 7 of Dr. Glenmullen's expert report, and certain of the opinions addressed in Sections 1, 2, and 3 of his expert report.  *See* Paley Decl. Ex. A (Expert Report of Dr. Joseph Glenmullen, Sept. 22, 2014) ("Rep.").  Specifically, this Court should exclude Dr. Glenmullen's proposed expert testimony on the following matters:

- the adequacy and veracity of Lilly's Cymbalta label (Section 6);
- whether the label minimizes and obfuscates Cymbalta's discontinuation risks and thereby fails to adequately inform, misinforms, or misleads physicians about Cymbalta's discontinuation profile (Sections 6 and 7);
- physicians' understanding of the Cymbalta label and Cymbalta's discontinuation risks (Sections 6 and 7);[1]
- Lilly's corporate motives and conduct (Section 7);
- other opinions, including flawed opinions on Lilly's clinical trials and Cymbalta's risks (Sections 1 and 3), and opinions parroting others (Section 2).

## BACKGROUND

Dr. Joseph Glenmullen is a psychiatrist in Cambridge, Massachusetts who until several years ago worked for Harvard University Health Services treating patients at Harvard Law School.  Paley Decl. Ex. B (Deposition Transcript of Dr. Joseph Glenmullen, Nov. 25, 2014) ("Dep.") at 5:23-7:24.  He has authored two books in the popular press on the "side effects of psychiatric medications": *Prozac Backlash*, published in 2000, and *The Antidepressant Solution*, published in 2005.  Rep. at 2.  He

[1] Although Dr. Glenmullen opines on physicians' *and patients'* understanding of the label, patients' understanding is irrelevant to this case.  Under California law, a pharmaceutical manufacturer's duty to warn about the risks of a prescription medication "runs to the physician, not to the patient."  *Motus v. Pfizer Inc.*, 196 F. Supp. 2d 984, 990-91 (C.D. Cal. 2001), *aff'd*, 358 F.3d 659 (9th Cir. 2004).

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

MOTION TO EXCLUDE TESTIMONY OF GLENMULLEN UNDER FED. R. EVID. 702

is a self-described "critic" of "doctors and patients not being adequately warned of" antidepressant side effects.  *Id.* at 3.

Dr. Glenmullen is also a prolific plaintiff's expert witness in antidepressant litigation.  He has been deposed more than 35 times.  Dep. at 5:15-19.  Each time that he has testified in a case where a plaintiff has alleged that a pharmaceutical product caused injury, or that a psychiatrist committed malpractice, he has testified for the plaintiff.  *Id.* at 9:11-16, 17:20–18:7.  He has testified against Johnson & Johnson over Risperdal, Pfizer over Chantix and Zoloft, Forest over Celexa and Lexapro, GlaxoSmithKline over Paxil, Bristol-Myers Squibb over Abilify, and Lilly over Prozac and Cymbalta.  *Id.* at 15:1–17.

Although Dr. Glenmullen deems himself an expert in pharmaceutical labeling, he has never worked for the FDA on a labeling issue, and he has never been asked to serve on an FDA Advisory Committee.  *Id.* at 35:24–36:4, 36:19-24.  He has never worked for or consulted with a pharmaceutical company on a labeling issue, a medicine's development or approval, or a potential side effect; nor has he ever presented to an FDA Advisory Committee on a company's behalf.  *Id.* at 37:2-19.  He has also never served as an investigator for a clinical trial, designed or written a protocol for a clinical trial, been part of a clinical trial that administered rating scales or testing instruments regarding psychiatric or psychological signs or symptoms, composed a clinical trial report of an actual study, or composed a peer-reviewed journal article summarizing raw data in connection with a clinical trial.  *Id.* at 20:23-25, 21:23–22:6, 24:8-18, 24:23–25:3.  In addition, he has never done a survey of physicians about their experience with Cymbalta, or any study or focus-group analysis of medical professionals' knowledge about the potential of antidepressants to cause discontinuation symptoms.  *Id.* at 76:17-25, 169:4-6, 169:16-18.  Nor has he meaningfully researched or written about Cymbalta, physicians' understanding of Cymbalta's discontinuation risks, or the Cymbalta label outside of this litigation.  Far from it, Dr. Glenmullen wrote *Prozac Backlash* in 2000, four years before Cymbalta

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

MOTION TO EXCLUDE TESTIMONY OF GLENMULLEN UNDER FED. R. EVID. 702

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

was introduced, and both *The Antidepressant Solution* and his few published articles lack Cymbalta-specific analysis.  *See* Rep. at Ex. 1 (listing publications); Dep. at 22:7-20 (testifying that that he had performed "statistical analyses of Lilly's Cymbalta data" for his expert report—not for independent research).

And yet, for the case at bar, Dr. Glenmullen purports to base his opinions on his "education, training, and clinical experience."  *See* Rep. at 1.  In the initial sections of his report, Dr. Glenmullen opines that "stopping Cymbalta causes withdrawal reactions in a high percentage of patients" and that "Cymbalta withdrawal can be severe, debilitating, and even life-threatening."  *Id.* at 1; *see also id.* at 5-32.  In the final two sections—Sections 6 and 7—Dr. Glenmullen opines that Lilly "obscured" the "frequency, severity, and duration of withdrawal symptoms" in Cymbalta's label, and that such "misrepresentations and omissions make it impossible for any patient or physician to make an informed decision about the appropriateness of taking or prescribing Cymbalta."  *Id.* at 33-41.

## LEGAL STANDARD

Under Rule 702, the proponent of expert testimony bears the burden of showing by a preponderance that (i) the expert is qualified, (ii) the testimony is reliable, and (iii) the testimony is relevant and will assist the jury.  Fed. R. Evid. 702; *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993); *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999).  In this Circuit, a perfunctory showing will not suffice; before expert testimony is admitted, the trial court must engage in the "complex," "daunting," and "difficult" task of ensuring that the testimony satisfies the strictures of Rule 702.  *Daubert v. Merrell Dow Pharm., Inc.*, 43 F.3d 1311, 1315 (9th Cir. 1995) ("*Daubert II*"); *see also Estate of Barabin v. AstenJohnson, Inc.*, 740 F.3d 457, 464 (9th Cir. 2014) (holding that trial court abused its discretion "by failing to make appropriate determinations under  [Rule 702]," which "'contemplates some degree of regulation of the subjects and theories about which an expert may testify'" (citation omitted)).  "A trial court's 'gatekeeping' obligation to admit only expert testimony that is both

reliable and relevant is especially important 'considering the aura of authority experts often exude, which can lead juries to give more weight to their testimony.'" *Stanley v. Novartis Pharm. Corp.*, 11 F. Supp. 3d 987, 995 (C.D. Cal. 2014) (citation omitted).

## ARGUMENT

## I.  Dr. Glenmullen's Testimony Should Be Excluded Because It Is Unreliable.

The fatal flaw in Dr. Glenmullen's proposed expert testimony is that it is not the product of any reliable method or based on any data.  His central opinions—namely, (i) that physicians, even after reading the Cymbalta label, will misunderstand Cymbalta's discontinuation risks, and (ii) that Lilly intentionally misled physicians about these risks—are disconnected from any methodology, are unsubstantiated by any evidence, and are purely conjectural.

### A. Applicable Legal Standards Regarding Reliability

Rule 702 requires the proponent to show that the expert testimony is "based on sufficient facts or data" and is "the product of reliable principles and methods" that have been "reliably applied" to the "facts of the case."  Fed. R. Evid. 702.  To discharge its responsibility as gatekeeper and to uphold this essential requirement of reliability, the trial court must "determine nothing less than whether the experts' testimony reflects 'scientific knowledge,' whether their findings are 'derived by the scientific method,' and whether their work product amounts to 'good science.'" *Daubert II*, 43 F.3d at 1315 (citation omitted).  The proponent of the expert testimony must "explain the expert's methodology and demonstrate in some objectively verifiable way that the expert has both chosen a reliable scientific method and followed it faithfully." *Id.* at 1319 n.11.

In this Circuit, moreover, an "untested," "unsubstantiated," or "undocumented" opinion is considered the "antithesis of the scientifically reliable expert opinion admissible under *Daubert* and Rule 702." *Cabrera v. Cordis Corp.*, 134 F.3d 1418, 1423 (9th Cir. 1998); *see also Cloud v. Pfizer Inc.*, 198 F. Supp. 2d 1118, 1129-30 (D. Ariz. 2001) (observing that "'scientific' implies a grounding in the methods and

MOTION TO EXCLUDE TESTIMONY OF GLENMULLEN UNDER FED. R. EVID. 702

procedures of science," and "'knowledge' connotes more than subjective belief or unsupported speculation" (citation and internal quotation marks omitted)). "'[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert.  A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.'"  *In re Nexium (Esomeprazole) Prods. Liab. Litig.*, 2014 WL 5313871, at *1 (C.D. Cal. Sept. 30, 2014) (citation omitted).

## B. Dr. Glenmullen's Opinions About How Physicians and Patients Read the Label and Comprehend the Risks Are Unreliable (Section 6).

### 1.  Dr. Glenmullen's  Opinions Are Methodologically Unsupported.

The opinions Dr. Glenmullen addresses in Section 6 of his report are unreliable because he does not base them on any evidence or employ any methodology to derive them.  Dr. Glenmullen opines that physicians, after reading the Cymbalta label, will inevitably conclude that "the frequency of withdrawal reactions is low, approximately 1% to 2% of patients."  *See* Rep. at 35.  In Dr. Glenmullen's view, because Lilly's clinical studies suggest that the actual frequency of discontinuation symptoms is 44.3% to 50.8%, the label's "1% to 2% figures" "fail to convey the magnitude and seriousness" of the discontinuation risk.  *See id.* at 33-36; *see also id.* at 7-11 (discussing Lilly's studies as reported in a 2005 *Journal of Affective Disorders* article ("2005 JAD Article")); Paley Decl. Ex. C (D.G. Perahia et al., *Symptoms Following Abrupt Discontinuation of Duloxetine Treatment in Patients with Major Depressive Disorder*, 89 J. of Affective Disorders 207 (2005)).

But the FDA-approved Cymbalta label, in fact, lists each individual discontinuation symptom observed in clinical trials to have occurred at a rate of 1% or greater.  The label does not state that the aggregate, overall frequency of occurrence for all discontinuation symptoms was only 1%.  *See id.* at 33 ("Discontinuation symptoms have been systematically evaluated in patients taking Cymbalta.  Following abrupt discontinuation in  placebo-controlled  clinical trials . . . , the  following

MOTION TO EXCLUDE TESTIMONY OF GLENMULLEN UNDER FED. R. EVID. 702

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

symptoms occurred at a rate greater than or equal to 2% and at a significantly higher rate in [Cymbalta-treated patients] compared to those discontinuing from placebo: dizziness; nausea . . . ."); *id.* at 34 (noting that label later adopted a 1% reporting threshold).  The label's list of individual adverse events that occurred at or above a specified reporting threshold—here, 1% or 2%— not only comports with industry standards and FDA regulations, but is also entirely consistent with the 2005 JAD Article's finding that the sum total of patients experiencing any adverse event was 44%.  Indeed, armed with the raw clinical data that was later reported in the 2005 JAD Article, the FDA discerned no inconsistency and approved the label in 2004.

Still, Dr. Glenmullen asserts that physicians consistently misread the label as indicating that the aggregate chance of a patient ever experiencing any listed symptom is about 1% to 2%.  *See* Dep. at 180:19–181:15.  In his own words:

> And *if* you are told by the manufacturer that—*if* you're led to believe by the label that [Cymbalta] is the best of all antidepressants because it causes withdrawal in 1 to 2 percent of patients, when the truth is . . . that it's more like 45 to 50 percent of patients or more, no, you can't make an informed decision to prescribe it, a properly informed decision to prescribe it.

*Id.* at 168:8-18 (emphasis added).  The key word is "if."  Dr. Glenmullen *assumes* that trained physicians cannot help but misread the Cymbalta label as stating that Cymbalta causes discontinuation symptoms in 1% to 2% of patients.  *See id.* at 180:19–181:15, 185:18-24.  But Dr. Glenmullen's assumption is just that—a naked assumption, unadorned with any evidence, that springs from the well of his own intuition rather than from any methodology.  Indeed, Dr. Glenmullen admits that he derived his opinion from his understanding of "common sense" and the "English language." *Id.* at 181:14-20, 182:9-12   He neglected to conduct or cite any physician surveys or focus-group analyses, any studies or articles, or any research or data to substantiate his idiosyncratic assertion that physicians misread the Cymbalta label in this particular way.  *See id.* at 76:17-25, 169:4-6, 169:16-18, 181:14-20,182:9-12.  His

1   opinion is supported only by his own say so, which is not enough for Rule 702. [2]

2   Furthermore, Dr. Glenmullen baldly asserts that physicians unvaryingly come

3   away from the label misinformed not only about the "frequency" of Cymbalta's

4   discontinuation symptoms, but also about other aspects of Cymbalta's discontinuation

5   profile, including the "severity" and "duration" of Cymbalta's discontinuation

6   symptoms.  *See* Rep. at 36-38.  He concludes that "Lilly's misrepresentations and

7   omissions make it *impossible* for *any* patient or physician to make an informed

8   decision about the appropriateness of taking or prescribing Cymbalta."  *Id.* at 38

9   (emphasis added); *see also id.* at 41 (opining that "Lilly's Cymbalta label misleads

10  doctors and patients in this country"); Dep. at 75:10-14 (testifying that "primary care

11  doctors," who write the majority of antidepressant prescriptions, are "very confused"

12  about Cymbalta's discontinuation risks); *id.* at 81:20–82:2 (same).  He also concludes

13  that "[d]octors like myself prescribe medicines such as Cymbalta relying on the

14  accuracy of the drug's label," and "rarely" "perform our own clinical studies,"

15  "research what other studies have been performed on a particular medication," or rely

16  on "other sources of information"—such as "pharmaceutical representative detailing,"

17  "recommendations by fellow physicians," or "medical journal publications"—over the

18  label.  Rep. at 33; *see also id.* at 41 ("Like myself, many American doctors would

19  have been unaware of [the 2005 JAD Article], whereas doctors are aware of and rely

20  on a drug's label. . . . "[D]octors generally rely on a drug's label as the ultimate

21  authority on a drug's safety and efficacy. . . . [I]n an instance such as this, where a

22  medical journal article gives a very different impression from a drug's label,

23  physicians generally would consider the label more authoritative . . . ."); Dep. at

24  185:18-24 ("I think doctors are going to—they're very busy.  They're going to quickly

25  _____

26  [2] *See In re Nexium*, 2014 WL 5313871, at *1; *Stanley*, 11 F. Supp. 3d at 1002 (excluding bisphosphonate dosing opinion because expert had "not provided any data to support" its reliability, "only vaguely referenced potential sources of information on which he based this opinion during his deposition, and there [was] no indication that [he] used any methodology in reaching this conclusion").

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

MOTION TO EXCLUDE TESTIMONY OF GLENMULLEN UNDER FED. R. EVID. 702

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

1  read [the label].").

2      Again, however, Dr. Glenmullen employs no methodology to draw these

3  conclusions.  He *assumes* that physicians rely exclusively on the label as their source

4  of information about Cymbalta, and that they consequently misunderstand the

5  "frequency," "severity," and "duration" of Cymbalta's discontinuation symptoms.

6  But he offers no supporting evidence that all physicians categorically and inexorably

7  behave this way—that they view the label and comprehend Cymbalta's

8  discontinuation profile in the manner that he urges.  He could have validated his

9  behavioral opinion with physician surveys or focus-group analyses, studies or articles,

10  or any other form of research or data.  Instead, he rested his opinion on *ipse-dixit*

11  reasoning.  *See id.* at 76:17-25, 169:4-18, 181:14-20,182:9-12.[3]

12      Dr. Glenmullen could also have tested his pet theory that the Cymbalta label is

13  inadequate and misleading by evaluating the label according to regulatory standards or

14  industry practices, or by comparing the label to other antidepressant labels.

15  Subjecting his theory to scrutiny would have strengthened its reliability.  *See In re*

16  *Bextra*, 524 F. Supp. 2d at 1171 (observing that an expert's failure to "test[]" a

17  "proffered theory or technique" weighs against reliability) (citation and internal

18  quotation marks omitted)).  But again, he elected not to employ any of these measures.

19  *See* Dep. at 120:3-10 (testifying that he had not compared Cymbalta's European label

20  with European labels for other antidepressants); *id.* at 204:7–218:6 (refusing to

21  compare Cymbalta label's frequency language with Paxil label's analogous frequency

22  ———————————————

23  [3]  At certain times in his deposition, Dr. Glenmullen testified that *every* physician

24  misunderstands Cymbalta's discontinuation risks.  *See* Dep. at 167:11-23; Rep. at 38 (stating that it is "impossible for any [physician] to make an informed decision").  But at other times in his deposition, Dr. Glenmullen dialed back this hyperbolic assertion:

25  "[M]any doctors, psychiatrists as well as primary care doctors . . . are not aware of the potential severity, frequency, duration, all the things that are misrepresented in Lilly's

26  label about Cymbalta."  *See* Dep. at. 169:10-15 (emphasis added).  The inconsistency in his testimony underscores the very methodological problem at issue.  He oscillates

27  between "many" and "all" because his opinion is not the product of a scientific

28  method.  He has no hard data, no concrete figure with which to moor his opinion.

1    language); *id.* at 233:13–234:9 (same with Effexor).

2       Notably, Dr. Glenmullen acknowledged at his deposition that he had not

3 reviewed Lilly documents that he himself deemed necessary to form a complete

4 opinion about the adequacy and veracity of the Cymbalta label.  Apparently unaware

5 that Lilly had long earlier produced Cymbalta's clinical trial reports, protocols, FDA

6 correspondence and labeling materials, and marketing materials, Dr. Glenmullen

7 repeatedly testified that he had neither received nor reviewed these documents.  *See*

8 Dep. at 61:3–62:17 (testifying that Lilly's documents, including those about Lilly's

9 clinical trials, would "absolutely" be important to his analysis); *id.* at 102:18–103:4

10 (opining on Lilly's clinical studies but stating: "I need Lilly's discovery.  I need the

11 . . . clinical study reports.  I need to examine that more closely."); *id.* at 89:20–90:8

12 (opining on Lilly's clinic trial protocols but stating that he had not reviewed the actual

13 protocols); *id.* at 123:14–124:21 (testifying that he did not know the origin of the last

14 two paragraphs of Section 5.6 of the label because he did not have discovery on

15 Lilly's original proposed label or FDA correspondence); *id.* at 71:25–72:11 (testifying

16 that Lilly's marketing materials would be important to his opinion about Lilly's intent

17 to obscure Cymbalta's discontinuation risks); *id.* at 73:22-25 (same about Lilly's

18 submissions to the FDA).  While it is not clear why counsel would not have provided

19 these materials to Dr. Glenmullen despite the central importance he placed on them,

20 the bottom line is that Dr. Glenmullen was both willing and eager to reach his

21 conclusions without the very documents he claimed were crucial to forming an

22 opinion.  By his own standard, Dr. Glenmullen's methodology is deficient.

23      **2. Training and Experience Do Not Confer Reliability on His Opinions.**

24       Dr. Glenmullen may not cure the methodological deficiency in his opinion by

25 arguing that his training and experience give him privileged insight into physicians'

26 view of the Cymbalta label or physicians' understanding of Cymbalta's

27 discontinuation profile.  Making generalizations about physicians based on untested

28 observations does not count as a methodology.  The court's decision in *In re Rezulin*

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

*Products Liability Litigation* is instructive.  309 F. Supp. 2d 531, 555–56 (S.D.N.Y. 2004).  There, the plaintiffs offered two physicians specializing in diabetes to discuss "what other physicians understood about the risks and benefits of Rezulin," a diabetes medication, and the "contents of the Rezulin label."  *Id.* at 555–56.  The experts also testified to general matters, including their opinion that physicians do not "always underst[and]" the "significance of a new medication comparing favorably to a placebo," and that physicians do not "generally examine a package insert for safety information about a medication."  *Id.* at 555.  To the court, all these statements were inherently unreliable: "The challenged opinions self-evidently discuss the practices of physicians as to reading labels or package inserts and their understandings of the contents of the Rezulin label.  Accordingly, these opinions are excluded under Rule 702 as speculative testimony."  *Id.* at 556.

Likewise, in *In re Seroquel Products Liability Litigation*, the court rejected the plaintiffs' argument that their expert's "knowledge, experience, training and education, including decades of prescribing antipsychotic drugs and instruction of medical students on their respective characteristics, more than qualif[ied] him to discuss the clinical psychiatrist's perception of scientific information" in the labeling of Seroquel, an antipsychotic medication.  2009 WL 3806436, at *7 (M.D. Fla. July 20, 2009).  The court declined the plaintiffs' invitation to permit the psychiatrist's training and experience to stand in for methodology: "[N]one of [p]laintiffs' experts may properly testify regarding whether physicians generally read and comprehend drug labels, or whether doctors generally understand the contents of the Seroquel label.  Such opinions are impermissibly speculative."  *Id.* at *8; *accord Pfizer Inc. v. Teva Pharm. USA, Inc.*, 461 F. Supp. 2d 271, 276–77 (D.N.J. 2006) (rejecting argument that expert was qualified to testify to "all physicians' understandings of the risks and benefits of NSAIDs" based on his "20 years [of] practicing rheumatology and prescribing NSAID therapies," as "testimony regarding what physicians in general think/know and how they make prescription decisions is speculative and not

MOTION TO EXCLUDE TESTIMONY OF GLENMULLEN UNDER FED. R. EVID. 702

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

1  based on reliable evidence").

2  Here, too, Dr. Glenmullen opines about the general "practices of physicians as

3  to reading labels," as well as physicians' "understandings of the contents of the

4  [Cymbalta] label" and "what other physicians understood about [Cymbalta's] risks

5  and benefits." *See In re Rezulin*, 309 F. Supp. 2d at 555–56; *see also* Rep. at 36-38

6  (discussing physicians' understanding of the Cymbalta label and the frequency,

7  duration, and severity of Cymbalta's discontinuation symptoms); *id.* at 33, 41 (opining

8  that physicians "generally" rely on a drug's label as "the ultimate authority on a drug's

9  safety and efficacy"); *id.* at 41 (opining that "Lilly's Cymbalta label misleads doctors

10 and patients in this country").  Like the expert testimony excluded in *In re Rezulin*, *In*

11 *re Seroquel*, and *Pfizer*, Dr. Glenmullen's testimony lacks any methodology and is

12 impermissibly speculative.

13  **3.  Dr. Glenmullen Does Not Account for Contrary Findings.**

14  The analytical gap between the data and Dr. Glenmullen's opinion appears

15 especially wide against the backdrop of *McDowell v. Eli Lilly & Co.*, a case from the

16 Southern District of New York where Judge Sweet canvassed the Cymbalta label and

17 determined that the discontinuation warning was "adequate as a matter of law because

18 it is 'accurate, clear, consistent on its face' and 'portrays [the discontinuation risks]

19 with sufficient intensity.'"   --- F. Supp. 3d. ---, 2014 WL 5801604, at *14-15

20 (S.D.N.Y. Nov. 7, 2014) (citation omitted).  In seeking reconsideration of that ruling,

21 Plaintiff's counsel submitted the expert reports from this case, including that of Dr.

22 Glenmullen.  Judge Sweet denied Plaintiff's motion.  *McDowell v. Eli Lilly & Co.*,

23 2015 WL 845720, at *1-6 (S.D.N.Y. Feb. 26, 2015).  In so ruling, Judge Sweet

24 rejected Plaintiff's reliance on Dr. Glenmullen's report to undermine his summary

25 judgment decision:

26  [The plaintiff] has cited Dr. Glenmullen's report as demonstrating that based on

27  the figures put forth in the [2005 JAD Article], the Cymbalta label does not

28  accurately characterize either the frequency or severity of discontinuation-

MOTION TO EXCLUDE TESTIMONY OF GLENMULLEN UNDER FED. R. EVID. 702

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

1    emergent adverse events.  This was the express theory of [plaintiff's complaint

2    and opposition to Lilly's] original motion.  The alleged discrepancies between

3    the discussion of discontinuation symptoms in the label and the results of the

4    [2005 JAD Article] were considered and it was concluded that, as a matter of

5    law, the label properly characterized the risks.  (*See* November 7 Order at 37–

6    38) ("Using a numerical threshold for the inclusion of adverse events in a label

7    is an appropriate, standard methodology for identifying adverse events arising

8    with sufficient frequency to warrant inclusion in the product label.").)

9    *Id.* at *3 (citations omitted).  Judge Sweet rejected Dr. Glenmullen's central opinion

10    that the Cymbalta label mischaracterizes discontinuation risks and contradicts the

11    2005 JAD Article, ruling instead as a matter of law that that the label's listing of

12    individual symptoms that occurred at or above the 1% threshold was appropriate.  *Id.*

13        In addition, both *McDowell* and another recent Cymbalta decision from South

14    Carolina, *Carnes*, endorse the commonsense position that a physician may have

15    "independent knowledge" of Cymbalta's discontinuation profile—that is, knowledge

16    based on training, research, or practical experience, as opposed to information gleaned

17    only from the label.  *See Carnes v. Ely Lilly & Co.*, 2013 WL 6622915, at *6 (D.S.C.

18    Dec. 16, 2013); *McDowell*, 2014 WL  5801604, at *15-16.  Even Dr. Glenmullen

19    cannot deny that physicians can learn about medications from numerous sources

20    besides the label, including colleagues, conferences, guidelines, and medical literature.

21    *See* Dep. at 223:13–225:14.

22        And yet, in reaching his ultimate conclusion, Dr. Glenmullen retreats from this

23    competing information, content to reject without consideration any contrary data and

24    maintain the sweeping generalization that all physicians blindly fail to grasp

25    Cymbalta's discontinuation risks from the label.  His methodology, to the extent he

26    has any, is to "'pick and [choose] from the scientific landscape and present the Court

27    with what he believes the final picture looks like. This is hardly scientific.'"  *Lust v.*

28    *Merrell Dow Pharm., Inc.*, 89 F.3d 594, 596 (9th Cir. 1996) (citation omitted); *see*

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

*also Abarca v. Franklin Cnty. Water Dist.*, 761 F. Supp. 2d 1007, 1066 n.60 (E.D. Cal. 2011) ("A scientist might well pick data from many different sources to serve as circumstantial evidence for a particular hypothesis, but a reliable expert would not ignore contrary data" or "make sweeping statements without support" (citation and internal quotation marks omitted)).

Indeed, Dr. Glenmullen's deposition exposed his susceptibility to cherry-picking and confirmation bias. Although Dr. Glenmullen confessed that physicians can learn about medications from various sources, *see* Dep. at 223:13–225:14, he flatly refused to entertain the notion that any source other than the Cymbalta label—such as the American Psychiatric Association Practice Guidelines, WebMD, or the current Diagnostic and Statistical Manual of Mental Disorders—could apprise physicians of Cymbalta's discontinuation risks, *see id.* at 78:12–80:22. Although he accepted that medical literature could address the issue of antidepressant discontinuation symptoms, *see id.* at 67:25–68:3, he refused to accept that a physician could use a basic research source such as PubMed to locate the 2005 JAD Article if she wanted to know the specific discontinuation data seen in the Cymbalta clinical trials, *see id.* at 195:16–196:4, 197:18–198:1. He even refused to accept that a trained physician could infer Cymbalta's discontinuation risks from the label's disclosure of Cymbalta's half-life, *see id.* at 105:24–106:15, even though his own report insists that the correlation between half-life and discontinuation risks is common medical knowledge, Rep. at 17-25. Unlike a reliable expert, Dr. Glenmullen cherry picks and overgeneralizes in the service of his predetermined, unshakeable conclusion. *See Abarca*, 761 F. Supp. 2d at 1066 n.60.

### 4. Dr. Glenmullen's Opinions Are Driven by Litigation.

Finally, the fact that Dr. Glenmullen has barely researched or written about Cymbalta, physicians' understanding of Cymbalta's discontinuation profile, or the Cymbalta label—outside of preparing for litigation—militates against the reliability of his testimony. *See supra* Background at 3-4. After all, Dr. Glenmullen is now a

MOTION TO EXCLUDE TESTIMONY OF GLENMULLEN UNDER FED. R. EVID. 702

career plaintiff's expert witness in antidepressant litigation.  The risk that he has shaped some of his Cymbalta-specific opinions for the purpose of litigation makes it all the more critical that his opinions stem from an objective methodology.  In fact, this Circuit requires that if an expert has formed an opinion for litigation and the expert's methodology has not been peer-reviewed, then the expert "must explain precisely how [the expert] went about reaching [the] conclusions and point to some objective source—a learned treatise, the policy statement of a professional association, a published article in a reputable scientific journal or the like—to show that [the expert has] followed the scientific method, as it is practiced by (at least) a recognized minority of scientists in [the] field."  *See Daubert II*, 43 F.3d at 1319 (affirming exclusion of testimony as unreliable where plaintiffs' experts on Benedictin, a morning sickness medication, "relied on animal studies, chemical structure analyses and epidemiological data" but "neither explain[ed] the methodology [they] followed to reach their conclusions nor point[ed] to any external source to validate that methodology").  In *Lust*, for example, the Ninth Circuit concluded that "it[was] not unreasonable to presume" that the opinion of a "professional plaintiff's witness" on Clomid, a fertility drug, "was influenced by a litigation-driven financial incentive," even though the witness had published a relevant article several years prior to the litigation.  89 F.3d at 597.  The court proceeded to affirm the exclusion of the expert's testimony as unreliable because the expert had not supported his work with peer-reviewed research and had not identified any objective methodology upon which his opinion was based.  *Id.*  Dr. Glenmullen's opinions—about how physicians understand the Cymbalta label and Cymbalta's discontinuation profile—suffer from the same shortcomings.

## C. Dr. Glenmullen's Opinions About Lilly's Corporate Motives Are Baseless and Unreliable (Section 7).

In Section 7 of his report, Dr. Glenmullen presents a narrative about Lilly's corporate motives and its supposed intent to mislead physicians with its Cymbalta

MOTION TO EXCLUDE TESTIMONY OF GLENMULLEN UNDER FED. R. EVID. 702

label.  Rep. at 39-41.  Dr. Glenmullen begins by recounting that, after Lilly introduced Prozac to the market in the late 1980s, Lilly sought to "secure a market advantage" over Paxil and Zoloft by intentionally "*mount[ing] a campaign*" in the mid-1990s "to call attention to" Prozac's "long half-life" and "low frequency of withdrawal reactions," especially compared to Paxil—which had a short half-life and was "one of the worst offenders."  *Id.* at 39 (emphasis added).  But in 2004, according to Dr. Glenmullen, Lilly suddenly "*did an about face*, minimizing and obscuring the risk with its new antidepressant with an extremely short half-life, Cymbalta."  *Id.* (emphasis added).  He continues:

> Thus, *Lilly was aware of the risks* associated with antidepressant withdrawal and its relationship to a drug's half-life.  And, *Lilly was making an issue of antidepressants* with short half-lives being the worst offenders when this was to the company's advantage promoting Prozac. Since Cymbalta's half-life is considerably shorter than Paxil's . . . *Lilly must have recognized the risk* of Cymbalta withdrawal was substantial compared to other newer antidepressants, as confirmed by its own clinical data. However, rather than being forthcoming about the degree of the Cymbalta risk, *Lilly chose to obscure the degree of risk* by using misleading language in Cymbalta's label once the company was marketing its own antidepressant with an extremely short half-life.

Rep. at 40 (emphasis added).

Dr. Glenmullen's tale about Lilly's machinations to obfuscate, minimize, and mislead constitutes pure conjecture.  The narrative he proposes to offer has no foundation and is not derived from any scientific method.  *See* Fed. R. Evid. 702.  In fact, although Lilly has produced its internal marketing materials and correspondence with the FDA to Plaintiffs in this litigation, and although Dr. Glenmullen testified that these materials would be crucial to his opinion about Lilly's corporate conduct and motives, he admitted that he had not reviewed these materials.  *See* Dep. at 71:25–72:11, 73:22-25, 75:15–76:2, 190:6-17;  *see also*  Argument  §  I.B.1.  at  10.

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

MOTION TO EXCLUDE TESTIMONY OF GLENMULLEN UNDER FED. R. EVID. 702

1  Consequently, instead of documentation, he purports to have somehow derived his
2  opinion—his lengthy narrative about Lilly's decades of alleged chicanery—from a
3  peculiar source: the Cymbalta label itself.  When he was asked at his deposition to
4  provide the "basis" for his opinion about Lilly's corporate conduct and motives, he
5  replied: "It's the label."  Dep. at 75:15-20; *see also id.* at 190:6-9 ("Q. What evidence,
6  other than the label, do you have that Lilly volitionally chose to obscure the degree of
7  risk? / A. I don't need anything more than the label."); *id.* at 200:7-14 ("Q. And is it
8  your view that Lilly was affirmatively trying to hide information about Cymbalta and
9  discontinuation events? / A. I'll stand by what I say in the report.  They minimized
10 and obscured. / Q. And your point is they do that through the wording of the label? /
11 A. Correct.").   He does not reveal how he read between the lines of the label to
12 conjure detailed information about Lilly's state of mind.

13         Furthermore, under black-letter evidentiary law, an expert's opinions on "the
14 intent, motives or states of mind of corporations" are unreliable by definition, as they
15 "have no basis in any relevant body of knowledge or expertise" and thus "lie outside
16 the bounds of expert testimony."  *See, e.g.*, *In re Rezulin*, 309 F. Supp. 2d at 545–47
17 (observing that such "musings" about corporate "motivations" would "not be
18 admissible if given by any witness—lay or expert" (citations and internal quotation
19 marks omitted)).   In *In re Rezulin*, for example, the court excluded expert opinions
20 that Warner-Lambert, the manufacturer of Rezulin, "chose" to provide "incomplete
21 information" about the Rezulin label, that Warner-Lambert "decided to focus on the
22 incomplete and inaccurate approval data and to minimize the troubling post-approval
23 data," that "it [was] highly improbable that [Warner-Lambert] was unaware" of the
24 risks of Rezulin, and that Warner-Lambert was "motivated by profit" to engage in
25 obfuscation.  *Id.* at 545–46, 545 n.38, 546 n.40.

26         Similarly, in *In re Trasylol Products Liability Litigation*, which concerned a
27 heart-surgery medication, the court precluded a career pharmaceutical plaintiff's
28 expert from testifying that Bayer "provided training and sales aids designed to help

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

- 17 -

minimize the risks of Trasylol for physicians," and that "Bayer was aware that despite its promotion of the full dose regimen, it had not tested, labeled or adequately warned physicians of the increased dose-dependent risks of the full dose when compared to the half dose." *In re Trasylol Prods. Liab. Litig.*, 709 F. Supp. 2d 1323, 1346 & n.30 (S.D. Fla. 2010). The court reasoned that exclusion was warranted because the expert had done "nothing more than rely on Bayer's internal documents to improperly opine on Bayer's motive"—which, notably, was still more than Dr. Glenmullen did. *Id.* at 1346; *see also In re Trasylol Prods. Liab. Litig.*, 2010 WL 1489793, at *9 & n.33 (S.D. Fla. Feb. 24, 2010) (precluding cardiologist-epidemiologist from testifying that Bayer had neglected safety signals concerning aprotinin and had declined to perform certain trials because it was "not in [Bayer's] interest," as expert was unable to explain "what work he had done to determine that it was not in Bayer's interest," and his testimony "rest[ed] on speculation about Bayer's subjective motivations"); *In re Trasylol Prods. Liab. Litig.*, 2010 WL 4052141, at *7-8 (S.D. Fla. May 12, 2010) (precluding anesthesiologist from testifying, based on his review of internal Bayer documents, that "Bayer was aware of significant risks inherent in the use of Trasylol" and that Bayer "manipulat[ed] the clinical community's impressions and opinions of the safety and efficacy of Trasylol"); *In re Fosamax Prods. Liab. Litig.*, 645 F. Supp. 2d 164, 193, 195 (S.D.N.Y. 2009) (precluding physician from testifying that Merck "refused to broadly inform physicians and patients about the risk of ONJ [osteonecrosis of the jaws]" associated with Fosamax); *Kaufman v. Pfizer Pharm., Inc.*, 2011 WL 7659333, at *9 (S.D. Fla. Aug. 4, 2011) (excluding opinions of regulatory expert as unreliable because expert "takes a collection of facts, imputes Wyeth's motive and knowledge to those facts, and draws unsupported conclusions that are unrelated to any regulatory experience that she has").

In light of this well-established case law, Dr. Glenmullen's musings about Lilly's corporate motives are inherently speculative. As in *In re Trasylol*, where the expert was precluded from opining that Bayer had mounted a misleading marketing

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

MOTION TO EXCLUDE TESTIMONY OF GLENMULLEN UNDER FED. R. EVID. 702

campaign, and as in *In re Rezulin*, where the expert was precluded from opining that Warner-Lambert was aware of but "chose" to minimize and obscure certain risks of Rezulin, Dr. Glenmullen may not properly testify that Lilly "mounted a campaign" to accentuate Prozac's long half-life, that Lilly hypocritically "did an about face" in marketing Cymbalta, or that Lilly was "aware of" but "chose to obscure" and "minimize" the risk of Cymbalta discontinuation.  *Compare In re Trasylol* 709 F. Supp. 2d at 1346, *and In re Rezulin*, 309 F. Supp. 2d at 545–46, *with* Rep. at 39-41.

Indeed, relative to the expert testimony excluded above, Dr. Glenmullen's corporate-motive testimony is particularly baseless.  Those experts improperly based their opinions on internal documents of the manufacturer of the drug at issue, *see, e.g.*, *In re Trasylol*, 2010 WL 4052141, at *7, but Dr. Glenmullen does not even go that far; he bases his opinion on the label alone.  To be sure, the section of Dr. Glenmullen's report about Lilly's corporate motives cites corporate documents.  But these documents are from GSK, not from Lilly.  *See* Rep. at 40 ("Internal GlaxoSmithKline memos and sales training materials document Lilly's campaign.  A May 1, 1997 GlaxoSmithKline memo states: 'Lilly has initiated a new campaign focused on discontinuation symptoms associated with cessation of SSRI antidepressants.'").  If basing an opinion about a manufacture's motives on that manufacturer's documents does not pass muster, then basing an opinion about a manufacturer's motives on a *competitor's* documents is even less defensible.

## D. Certain of Dr. Glenmullen's Other Opinions Are Also Methodologically Flawed and Unreliable (Sections 1 and 3).

In Section 1 of his report, Dr. Glenmullen opines that Lilly's Cymbalta clinical trials demonstrated that Cymbalta causes severe discontinuation symptoms.  Rep. at 5-12.  In Section 3, he opines that Cymbalta's short half-life renders it one of the "worst offenders" for antidepressant discontinuation.  *Id.* at 17-25.  Several methodological problems infect certain of his opinions.  First, as noted, although Lilly produced its full clinical trial reports, clinical trial protocols, and FDA-related materials to

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

- 19 -

Plaintiffs, Dr. Glenmullen testified that he had not reviewed these documents. He insisted that these documents were important to form opinions about Lilly's clinical trials and Cymbalta's discontinuation risks, but even without them, he opined anyway. *See* Dep. at 61:3–62:17, 89:20–90:8, 102:18–103:4, 123:14–124:21; 188:3-10; *see also supra* Argument § I.B.1. at 10.

Second, Dr. Glenmullen has limited experience with, and knowledge about, Cymbalta. He cannot recall prescribing it to a patient, *see* Dep. at 43:6-11, and he has barely researched or written about it, *see supra* Background at 3-4. He also lacks experience conducting and analyzing clinical trials. *See id*. To fill the gaps in his knowledge and make conclusions about Lilly's clinical trials, Dr. Glenmullen has extrapolated from research about antidepressants with which he is more familiar, such as Effexor. *See, e.g.*, Rep. at 17-19 (extrapolating from studies of Effexor, Paxil, Zoloft, and Prozac, which suggested a relationship between half-life and frequency/onset of symptoms, to establish same correlation for Cymbalta); Dep. at 95:23–96:24 (testifying that he was extrapolating from non-Cymbalta data); *see also* Rep. at 23 & n.67 (discussing the "close temporal relationship between lowering the dose of Cymbalta and the abrupt development of symptoms," but citing 1996 study about Effexor); *cf.* Dep. at 130:23– 131:1 (admitting that Table 6 in Section 3 of his report, which provides the typical onset of symptoms for each antidepressant, involved no formal analysis and was based on "general gut . . . judgment"). Such extrapolation undermines the reliability of his opinions. *See In re Bextra*, 524 F. Supp. 2d at 1180 (observing that unjustifiable extrapolation undermines reliability).

Third, Dr. Glenmullen resorts to brazen cherry-picking. Dr. Glenmullen cites the 2005 JAD Article for two vital statistics: Lilly's short-term trial showed that Cymbalta discontinuation symptoms occurred in about 44% of patients overall; Lilly's 52-week trial showed that symptoms occurred in about 51% of patients. *See* Rep. at 9-11; *see also supra* Argument I.B.1 at 6. But the 2005 JAD Article contains a third statistic that Dr. Glenmullen declines to mention in his report: Lilly's 34-week trial

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

showed that reactions occurred in only 9.1% of patients.  *See* Dep. at 102:5-17; Paley Decl. Ex. C, at 343; *see also McDowell*, 2014 WL 5801604, at *3 (summarizing the 2005 JAD Article).  Dr. Glenmullen himself acknowledged that he disregarded the third statistic because it did not fit his theory.  *See* Dep. at 102:5-17 (testifying that "it's a very low number" and that he did not "find it credible").

## II.  Dr. Glenmullen's Testimony Should Be Excluded Because It Will Not Assist the Trier of Fact (Sections 2 and 7).

Dr. Glenmullen's opinions are inadmissible on the independent ground that they are not "relevant"—that is, they will not assist the trier of fact in understanding the case or "logically advance[] a material aspect of the case."  *See In re Bextra*, 524 F. Supp. 2d at 1171.  First, as shown, Dr. Glenmullen's proposed expert testimony is "too speculative to merit admission as expert opinion that can 'assist the trier of fact . . . .'"  *See Brighton Collectibles, Inc. v. Renaissance Grp. Int'l*, 2008 WL 5500659, at *4 (S.D. Cal. May 13, 2008).

Second, in Section 2 of his report, Dr. Glenmullen summarizes findings from *QuarterWatch*, a newsletter by the Institute for Safe Medication Practices, that concerned Cymbalta discontinuation symptoms. *See* Rep. at 13-16.  *QuarterWatch* evaluates adverse event reports to the FDA.  Dr. Glenmullen did not analyze data informing the *QuarterWatch* newsletters; rather, he merely repeated their findings. *See* Dep. at 153:6-17, 154:12-18.  Such "me too" testimony will not assist the jury. *See In re Rezulin*, 309 F. Supp. at 546 (excluding expert testimony that "merely repeated facts or opinions stated by other potential witnesses or in documents produced in discovery").

Third, Dr. Glenmullen's narrative about Lilly's corporate motives, as presented in Section 7 of his report, is particularly vulnerable on the ground of relevance. "'[A]n expert cannot be presented to the jury solely for the purpose of constructing a factual narrative,'" especially one that the jury is equally capable of constructing.  *In re Fosamax*, 645 F. Supp. 2d at 192 (citation omitted); *see also id.* (precluding

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

MOTION TO EXCLUDE TESTIMONY OF GLENMULLEN UNDER FED. R. EVID. 702

regulatory expert from recounting factual events concerning the drug at issue); *In re Rezulin*, 309 F. Supp. 2d at 551 (same); *In re Trasylol*, 709 F. Supp. 2d at 1346 (same). What is more, it is well settled that a company's "knowledge, state of mind, alleged bad acts, failures to act, or other matters related to corporate conduct and ethics are not appropriate subjects of expert testimony because opinions on these matters will not assist the jury." *In re C.R. Bard, Inc.*, 948 F. Supp. 2d 589, 610-11 (S.D. W. Va. 2013) (precluding gynecologist's testimony that Bard was aware of safety problems with its Avaulta products but withheld this information from physicians); *see also In re Rezulin*, 309 F. Supp. 2d at 545–47 (precluding expert testimony about pharmaceutical company's motives on relevance grounds); *In re Trasylol*, 709 F. Supp. 2d at 1347 ("[The expert] has no expertise that allows her to infer Bayer's . . . knowledge and intent and present those inferences to the jury. Therefore, [the expert] generally does not offer testimony involving 'scientific, technical, or other specialized knowledge' that would assist the trier of fact to understand the evidence or to determine a fact in issue"); *In re Trasylol*, 2010 WL 4052141, at *8 ("[T]hese opinions describe lay matters which a jury is capable of understanding without the expert's help; inferences about intent and motive are classic jury questions.").

In *Tyree v. Boston Scientific Corp.*, for example, the court precluded an expert from testifying that Boston Scientific "knew the complication rates [of its mesh products] yet failed to include them in the warnings and/or labeling," "was aware of debilitating outcomes," "ignored the numerous red flags raised by multiple agencies, publications and physicians," and "used 'anti-warnings' to deliberately misrepresent dangerous products as safe." 2014 WL 5320566, at *51 (S.D.W. Va. Oct. 17, 2014). The court reasoned that the testimony could not assist the jury because "[t]he reasonableness of conduct and a party's then-existing state of mind 'are the sort of questions that lay jurors have been answering without expert assistance from time immemorial.'" *Id.* (citation omitted).

MOTION TO EXCLUDE TESTIMONY OF GLENMULLEN UNDER FED. R. EVID. 702

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

1    Dr. Glenmullen's factual narrative about Lilly's corporate motives would
2  similarly be unhelpful to the jury.  Like the testimony excluded in *Tyree*, Dr.
3  Glenmullen's story does not involve the application of his claimed scientific expertise.
4  A jury is more than capable of evaluating the actual admissible evidence and drawing
5  its own conclusions.

6    Remarkably, this is not the first time that Dr. Glenmullen has attempted to
7  regale a jury with irrelevant opinions.  In *Mason v. Smithkline Beecham Corp.*, the
8  court struck the bulk of Dr. Glenmullen's second expert report because it was "based
9  largely on information available to and in the possession of Dr. Glenmullen before he
10 authored his first report."  2007 WL 924043, at *2-3 (C.D. Ill. Mar. 26, 2007).  The
11 second report criticized GSK's presentation of Paxil data as "misleading" and
12 "misrepresentative" of Paxil's "safety and efficacy."  *Id.* at *3.  The court found that
13 untimely disclosure was not harmless in part because

14        portions of Dr. Glenmullen's remarks . . . do not appear to be expert opinion,
15        but instead attempts to introduce irrelevant and/or prejudicial information and
16        argument, or are attempts to establish facts of which Dr. Glenmullen has no
17        "expert" or personal knowledge.  These sorts of comments are also not harmless
18        because they place significant culling burden on both Defendant and the
19        Court. . . . At times Dr. Glenmullen quotes portions of FDA transcripts, memos
20        or other documents that speak for themselves, drawing his own layman's
21        inferences about the knowledge and motive of FDA employees. For example:
22        "Dr. Brecher [of the FDA] had no way of knowing that GSK's per patient
23        exposure years calculations were inappropriate."  "Responding to public and
24        professional fear, . . . the FDA held a day-long hearing . . . [.]"

25 *Id.* at *4 & n.5 (citations omitted).  Dr. Glenmullen is again introducing irrelevant
26 information about which he has no expert or personal knowledge.

27 **III.    Dr. Glenmullen Is Unqualified to Render His Opinions.**

28        Dr. Glenmullen's opinions are also inadmissible because he is not qualified to

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

1   testify to many of the matters in his report.  Courts have repeatedly held that an
2   expert's training and experience in a field relevant to a particular drug will not
3   necessarily qualify the expert to opine about the adequacy of that drug's label.  *See*
4   *Miller v. Pfizer, Inc.*, 196 F. Supp. 2d 1062, 1088-90 (D. Kan. 2002) (precluding a
5   psychiatrist who prescribed Zoloft and had written extensively about the danger of
6   SSRI-induced suicide from testifying that Zoloft's label did not adequately warn
7   against this danger because he had never drafted a warning), *aff'd*, 356 F.3d 1326
8   (10th Cir. 2004); *Rhodes v. Bayer Healthcare Pharm., Inc.*, 2013 WL 1289050, at *6-
9   7 (W.D. La. Mar. 26, 2013) (precluding a pharmacy professor from testifying that
10  Avelox's labeling was inadequate to warn against peripheral neuropathy because he
11  had "never provided opinions to any regulatory agency regarding the adequacy of a
12  drug's warning," had "never consulted with pharmaceutical companies in developing
13  labeling," and had never "written any labeling himself"); *Brown v. Roche Labs., Inc.*,
14  2013 WL 2457950, at *3 (N.D. Ga. June 6, 2013) (precluding a chemist from
15  testifying about the Rocephin label's efficacy because he had never "consulted with
16  the FDA regarding the content of a drug package insert"), *aff'd*, 567 F. App'x 860
17  (11th Cir. 2014); *Tyree*, 2014 WL 5320566, at *36-37 (precluding a urogynecologist
18  from testifying about information that should have been in the Obtryx sling manual
19  because he had "never drafted a [medical] device warning" and his "understanding of
20  medical device warnings [did] not exceed the knowledge of physicians in general").

21       Courts have also routinely held that an expert's training and experience in a
22  field relevant to a drug will not necessarily qualify the physician to opine about other
23  physicians' understanding of the drug's label or the risks and benefits of the drug, or
24  the manufacturer's motives in labeling or marketing the drug.  *See, e.g.*, *In re Trasylol*
25  *Prods. Liab. Litig.*, 2011 WL 7109297, at *5-6 (S.D. Fla. Apr. 27, 2011) (precluding
26  anesthesiologist from testifying that the Trasylol label is "medically inaccurate" and
27  contains "false and misleading" information about the risk of renal failure, as expert
28  had no regulatory or labeling expertise, and was unqualified "to opine as to what

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

MOTION TO EXCLUDE TESTIMONY OF GLENMULLEN UNDER FED. R. EVID. 702

physicians in general think"); *In re Rezulin*, 309 F. Supp. 2d at 546 n.40 (precluding testimony on pharmaceutical company's motives on the ground that none of the experts "claimed any particular expertise on the intent, motive or state of mind of corporations or regulatory agencies").

The court's approach in *In re C.R. Bard* is particularly applicable here.  948 F. Supp. 2d at 610-11.  There, the court precluded a urogynecologist with "stellar qualifications" from testifying: that Bard knew about but did not mention the safety risks of its Avaulta mesh product in its labeling or in its physician and patient education materials; that Bard did not adequately warn surgeons about these risks; and that Bard "should have investigated and resolved a complication of this magnitude" before marketing the product.  *See id.*  The court grounded its ruling not only on the testimony's unreliability and irrelevance, but also on the expert's lack of qualifications to opine on those matters.  *See id.*

Here, similarly, Dr. Glenmullen spews opinions beyond the ambit of his expertise.  Like the experts excluded in *Miller* and *Rhodes*, Dr. Glenmullen is unqualified to opine on the Cymbalta label's adequacy because, despite his psychiatric training and experience, he has never drafted a label and has never worked for or consulted with a regulatory agency or pharmaceutical company on labeling.  *Compare supra* Background at 3, *with Miller*, 196 F. Supp. 2d at 1088-90, *and Rhodes*, 2013 WL 1289050, at *6-7  And like the experts excluded in *In re Trasylol* and *In re Rezulin*, Dr. Glenmullen is unqualified to opine on physicians' view of the Cymbalta label, physicians' comprehension of Cymbalta's discontinuation risks, and Lilly's motives.  He has no specialized knowledge or skill with which to divine what physicians generally think, *see In re Trasylol*, 2011 WL 7109297, at *5-6, and he does not claim expertise in corporate intent, *see In re Rezulin*, 309 F. Supp. 2d at 545 n.40.

## CONCLUSION

This Court should exclude Dr. Glenmullen's inadmissible opinions.

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

MOTION TO EXCLUDE TESTIMONY OF GLENMULLEN UNDER FED. R. EVID. 702

1    DATED:    March 4, 2015        Respectfully Submitted,

2                                   /s/ David E. Stanley

3                                   David E. Stanley
                                    REED SMITH LLP
4

5                                   Michael X. Imbroscio (*pro hac vice*)
                                    Phyllis A. Jones (*pro hac vice*)
6                                   Kathleen E. Paley (*pro hac vice*)
                                    COVINGTON & BURLING LLP
7

8                                   Attorneys for Defendant
                                    ELI LILLY AND COMPANY
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

- i -