UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CLAUDIA HERRERA AND PETER LOWRY,<br><br>    Plaintiffs,<br><br>    v.<br><br>ELI LILLY AND COMPANY, an Indiana Corporation,<br><br>    Defendant. | CASE NO. 2:13-cv-02702-SVW-MAN<br><br>ORDER GRANTING IN PART DEFENDANT'S MOTION TO EXCLUDE EXPERT TESTIMONY OF DR. JOSEPH GLENMULLEN [138, 313], GRANTING IN PART DEFENDANT'S SUPPLEMENTAL MOTION TO EXCLUDE EXPERT TESTIMONY OF DR. JOSEPH GLENMULLEN [273] |

## I. INTRODUCTION

This products liability action arises from plaintiff Claudia Herrera's ("Herrera") alleged "discontinuation" symptoms upon ceasing to take Cymbalta—defendant Eli Lilly and Company's ("Lilly") serotonin norepinephrine reuptake inhibitor ("SNRI"). Herrera and her husband, plaintiff Peter Lowry ("Lowry"), allege that Lilly failed to adequately warn of the risk and severity of discontinuation side effects upon discontinuing Cymbalta. This case has been tied up in a long discovery battle, which ultimately culminated in Plaintiffs coming forward with documents that were allegedly either improperly withheld or buried in a massive document production delivered just before the close of discovery. In light of these documents, on June 19,

2015, the Court allowed Plaintiffs to file an amended complaint and amended expert declarations. (Dkt. 306.)

In their Corrected First Amended Complaint ("FAC"), Plaintiffs assert causes of action for: (1) negligence; (2) strict product liability—failure to warn; (3) negligent misrepresentation; and (4) fraud. (Dkt. 309.)

Presently before the Court are Lilly's motion to exclude the expert testimony of Dr. Joseph Glenmullen ("Glenmullen") (dkts. 138, 313), Lilly's supplemental motion to exclude Glenmullen's expert testimony (dkt. 273), and Lilly's motion to exclude expert Dr. Louis Morris's ("Morris") testimony (dkt 139, 314). For the reasons discussed below, the Court GRANTS IN PART Lilly's motions to exclude Glenmullen and Morris.[1]

## II. LEGAL STANDARD

Federal Rule of Evidence 702 governs the admissibility of expert testimony in federal court. Rule 702 provides that:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert . . . may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702.

Under Federal Rule of Evidence 104(a), the admissibility of expert testimony is for the Court to decide as a matter of law. *See Bourjaily v. United States*, 483 U.S. 171, 175-76 (1987). To that end, the Supreme Court has recognized the obligation of the trial court to perform a "gatekeeping role" to "ensure that any and all scientific testimony . . . is not only relevant, but reliable." *Daubert v. Merrell Dow Pharm.*, 509 U.S. 579, 589 (1993). Since "[d]istrict courts are not required to hold a *Daubert* hearing before ruling on the admissibility of scientific evidence," this Court can rule on Defendant's *Daubert* motion on the basis of the parties' papers. *In re Hanford Nuclear Reservation Litigation*, 292 F.3d 1124, 1138 (9th Cir. 2002) (citing *United States v. Alatorre*, 222 F.3d 1098, 1100 (9th Cir. 2000)). Moreover, the Ninth Circuit

---

[1] The Court addresses the parties' other pending motions in limine in a separate Order.

2

reviews the district court's decision whether to exclude testimony under an abuse of discretion standard. *See, e.g., Metabolife Int'l, Inc. v. Wornick*, 264 F.3d 832, 839 (9th Cir. 2001); *Maffei v. N. Ins. Co. of New York*, 12 F.3d 892, 897 (9th Cir. 1993).

In *Daubert*, the Supreme Court interpreted Federal Rule 702 in the context of scientific expert testimony and set forth factors for the courts to consider in performing their gatekeeping function to determine whether to admit expert testimony. *Daubert*, 509 U.S. at 592-96. According to the Court, these factors include whether a scientific technique "can be (and has been) tested," "whether the theory or technique has been subjected to peer review and publication," "the known or potential rate of error" of a particular scientific technique," and "general acceptance" in the relevant scientific community. *Id.* The Court emphasized that the Rule 702 inquiry is flexible, so the list of relevant factors is not exhaustive. *Id.* at 596; *see also United States v. Hankey*, 203 F.3d 1160, 1168 (9th Cir. 2000). In 1999, the Supreme Court extended *Daubert* to apply to all types of expert testimony, including that based on technical or other specialized knowledge, and reiterated the idea that district courts have broad latitude in determining whether expert testimony is admissible. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141-42 (1999).

Federal Rule of Evidence 702's requirement that an expert be qualified by knowledge, skill, experience, training, or education "'contemplates a broad conception of expert qualifications.'" *Hangarter v. Provident Life & Acc. Ins. Co.*, 373 F.3d 998, 1015 (9th Cir. 2004) (quoting *Thomas v. Newton Int'l Enters.*, 42 F.3d 1266, 1269 (9th Cir. 1994)). "Moreover, 'the advisory committee notes emphasize that Rule 702 is broadly phrased and intended to embrace more than a narrow definition of qualified expert.'" *Id.* (quoting *Thomas*, 42 F.3d at 1269).

**III. ANALYSIS**

    **A. Dr. Joseph Glenmullen**

Glenmullen is a psychiatrist who graduated from Harvard Medical School in 1984. (Paley Decl. in Supp. Def.'s Mot. to Exclude Glenmullen ("Paley Decl. re Glenmullen"), Ex. A ("Glenmullen Rep."), at 56.) Glenmullen has had a private clinical psychiatry practice since

3

1986. (*Id.* at 55.) From 1988 to 2008 he worked as a clinical psychiatrist for Harvard Law School Health Services. (*Id.*) Glenmullen's academic appointments include working as a clinical instructor in psychiatry at Harvard Medical School from 1988 to present. (*Id.*) Glenmullen is the author of two books regarding psychiatric medicines' side effects—including antidepressant withdrawal. (*Id.* at 5.) Glenmullen asserts that he has become a "national spokesperson for the appropriate, measured use of psychiatric medications." (*Id.* at 6.)

Lilly moves to exclude all of Glenmullen's testimony regarding general causation and most of his testimony regarding specific causation on a variety of grounds.

### 1. General Causation

#### a. Motion to Exclude Glenmullen's Testimony Entirely

Lilly asserts generally that Glenmullen's testimony should be entirely excluded because he lacks a reliable methodology. According to Lilly, Glenmullen "cherry-picked" through documents and data, periodically providing supplemental reports explaining how the "newly" discovered data supports his previously expressed opinions. Plaintiffs assert that this is the first of many similar cases to go to trial, and that it is proper for Glenmullen to supplement his report as documents are produced in connection with other cases. Plaintiffs also point to the discovery issues surrounding Lilly's internal documents as a justification for Glenmullen's failure to consider certain documents before filing his original report and before his June 1, 2015 deposition.

As a general matter, while Glenmullen's pattern of filing a report and later opining in supplements that the data supports his prior conclusions raises significant questions regarding Glenmullen's credibility, it does not independently render his opinions inadmissible. Moreover, Glenmullen's failure to consider evidence before June 1, 2015 is excusable to the extent that this failure is related to the ongoing discovery issues in this case. However, given that Glenmullen has not been deposed in this case or the related *Hexum* case regarding his recent supplemental report, the Court cannot evaluate Lilly's argument that Glenmullen fails to adequately consider certain purportedly relevant studies that he summarily lists in the index to that report. For this reason and the reasons discussed during the pretrial conference held on July 29 through July 30,

2015, the Court ORDERS Glenmullen to provide a declaration addressing this issue. The exact parameters and due date for Glenmullen's declaration are described in more detail below.

### b. Motion to Exclude Certain Opinions

Lilly also moves to exclude Glenmullen's proposed expert testimony regarding: (1) the adequacy and veracity of Lilly's Cymbalta label; (2) whether the label "minimizes and obfuscates Cymbalta's discontinuation risks and thereby fails to adequately inform, misinforms, or misleads physician about Cymbalta's discontinuation profile"; (3) physicians' understanding of the Cymbalta label and Cymbalta's discontinuation risks; (4) Lilly's corporate motives and conduct; and (5) "other opinions, including flawed opinions on Lilly's clinical trials and Cymbalta's risks (Sections 1 and 3), and opinions parroting others (Section 2).

Plaintiffs have agreed that Glenmullen will not testify to: (1) how physicians and patients generally read the Cymbalta label and comprehend the relevant risks; (2) Lilly's motives or intent; (3) witness credibility, including that of Plaintiffs, physicians, or Lilly employees; or (4) general defense strategies in products liability litigation. (Dkt. 313: Mot. at 9.) The Court addresses in turn each of the remaining opinions to which Lilly objects.

### c. Cymbalta's Label's Adequacy, Veracity, and Tendency to Mislead

In his report, Glenmullen opines that prescribing physicians rely on the accuracy of a drug's label to educate themselves about a medication. (Glenmullen Rep. 36.) He opines that doctors rarely perform their own clinical studies and only rarely have the time to conduct their own research. (*Id.*) While he acknowledges that doctors have access to other sources of information—such as pharmaceutical representatives and fellow physicians—he states that treating physicians rely on the label as the ultimate authority on a drug's safety and efficacy. (*Id.*) Glenmullen also opines that Lilly obscured the results of its clinical trials by publishing the 2005 JAD Article in a journal published in the Netherlands which Glenmullen claims is not widely read in the United States. (*Id.* at 44.) For this reason, Glenmullen claims that many American doctors would have been aware of Cymbalta's label but not of the 2005 JAD Article. (*Id.*) He further opines that even if physicians were aware of the 2005 JAD Article, they would

5

1  credit the label over the article to the extent that they appeared contradictory.  (*Id.*)

2  Glenmullen also opines that the Cymbalta label is misleading in a number of ways,
3  including: (1) its use of "discontinuation symptoms" rather than "Cymbalta Withdrawal"; (2) its
4  statement that discontinuation symptoms were "systematically" monitored; (3) as is relevant
5  here, its statement that the enumerated symptoms occurred at a rate greater than or equal to 2%;
6  (4) its failure to indicate the severity or duration of discontinuation symptoms; (5) its statement
7  that the spontaneously reported adverse events during the marketing of other SSRIs and SNRIs
8  were "generally self limiting, [though] some have been reported to be severe"; and (6) its
9  statement about spontaneous reports of adverse events during the marketing of "other SSRIs and
10 SNRIs."  (*Id.* at 36–40.)

11  In his most recent supplemental report, Glenmullen opines that the data and emails that
12 recently came to light support his previously expressed opinion that using a checklist of
13 withdrawal symptoms would show that Cymbalta had a risk of discontinuation symptoms even
14 higher than 44%.  (Esfandiari Decl., Ex. 3 ("Glenmullen June Supp."), at 1–2.)

15  Glenmullen fails to cite any relevant authority supporting has opinions regarding
16 physicians' general prescribing practices, physicians' reliance on the label, whether they would
17 have been familiar with the 2005 JAD Article, and whether Lilly intentionally obscured the
18 clinical trials by publishing the 2005 JAD Article in an obscure journal.  Similarly, these
19 opinions are not based on any study—whether conducted by Glenmullen or another expert—of
20 prescribing physicians' practices or understanding of various terms used in drug labels.
21 Glenmullen also fails to establish a reliable methodology by which he reached these conclusions.
22 The Court therefore EXCLUDES Glenmullen's opinions regarding physicians' general methods
23 of researching and informing themselves about drugs those physicians prescribe, whether
24 physicians generally credit the drug label over other sources, whether physicians would have
25 been aware of the 2005 JAD Article, and whether Lilly buried the clinical results by publishing
26 the 2005 JAD Article in a purportedly obscure journal.

27  Glenmullen's other opinions regarding Cymbalta's label's adequacy raise more difficult
28 questions.  The Court thus rules on the motion to the extent possible based on the current record,

6

1  and reserves ruling on other aspects until Glenmullen submits his declaration.  In particular, the
2  Court DECLINES TO REACH whether Glenmullen may opine that it is his professional opinion
3  as a clinical psychiatrist that Cymbalta's label does not adequately reflect the data.

4  Given his expertise in clinical psychiatry, his experience prescribing antidepressants, and
5  his publications about antidepressant withdrawal, Glenmullen is qualified to opine that Cymbalta
6  can cause discontinuation symptoms and to testify regarding the nature of those symptoms.
7  Glenmullen may also testify regarding the clinical data that he examined.  He may also compare
8  data from different studies that he examined.  Similarly, he may critique the methodology by
9  which data in a given study was collected and explain why he places greater weight on some
10 studies as opposed to others.  However, Glenmullen may not directly opine regarding credibility
11 or speculate regarding what would have happened in a given study if a different methodology
12 (such as a checklist) were used.

13 Finally, Lilly correctly argues that Glenmullen's opinion regarding the severity of
14 discontinuation symptoms is inadmissible.  Glenmullen fails to establish that his definitions of
15 "mild", "moderate", and "severe" discontinuation symptoms are based on objective criteria.
16 Instead, it appears that Glenmullen invents his own definitions and calls the Cymbalta label
17 inadequate on that basis.  The only authority that he cites for these definitions is his own book
18 (which he cites generally without pointing to any specific pages).

20                 d.     <u>Lilly's Corporate Motive and Conduct and Summarizing</u>
21 <u>Documents</u>

22 In his report, Glenmullen opines that Lilly must have known that Cymbalta's risk of
23 discontinuation side effects was substantial compared to other "newer" antidepressants because
24 Lilly knew that Cymbalta's half-life is the second shortest after Effexor—and Lilly knew of the
25 risks of antidepressants with short half-lives.  (Paley Decl. re Glenmullen, Ex. A, at 43.)
26 Glenmullen illustrates his point by describing Lilly's efforts to gain a market advantage for
27 Prozac by touting it as an antidepressant with a long half-life and thus a relatively low risk of
28 discontinuation side effects.  (*Id.* at 42.)  As noted above, Glenmullen also opines that Lilly hid

the risk of Cymbalta discontinuation side effects by publishing the 2005 JAD Article in a supposedly obscure journal. (*Id.* at 44.)

Plaintiffs now assert that Glenmullen will not testify to Lilly's corporate motive, but that they will elicit his testimony regarding Lilly's corporate conduct. To the extent that Glenmullen seeks merely to recount the history of Lilly's clinical studies, marketing efforts, and publication of the 2005 JAD Article, Glenmullen's testimony is neither helpful to the trier of fact nor based on his psychiatry expertise. This testimony is thus not admissible. *See In re C.R. Bard, Inc.*, 948 F. Supp. 2d 589, 611 (S.D.W. Va. 2013) ("Bard's knowledge, state of mind, alleged bad acts, failures to act, or other matters related to corporate conduct and ethics are not appropriate subjects of expert testimony because opinions on these matters will not assist the jury."). Similarly, Glenmullen may not summarize the findings from the Institute for Safe Medication Practices' newsletter (*QuarterWatch*). However, Glenmullen may testify regarding the correlation between half-life length and the risk of discontinuation side effects. He may also testify that based on Cymbalta's half-life, a reasonable drug manufacturer should have known that Cymbalta carried a significant risk of discontinuation side effects.

### 2. Supplemental Report Regarding Specific Causation

In his supplemental report, Glenmullen offers a host of opinions regarding specific causation—i.e. whether Herrera's symptoms were caused by Cymbalta discontinuation. The thrust of Glenmullen's opinion is that Herrera's complained-of post-Cymbalta symptoms were caused by Cymbalta discontinuation rather than by hypothyroidism, perimenopause, or the reemergence of Herrera's prior problems treated with Cymbalta. Lilly moves to exclude Glenmullen's opinions on the following subjects: (1) whether Herrera actually had MDD in 2007; (2) whether Herrera was properly diagnosed with perimenopause and hypothroidism; and (3) the meaning of certain fact witnesses' testimony.[2]

---

[2] Lilly also moves to exclude Glenmullen's opinions regarding: (1) four Lilly internal documents that Glenmullen produced at his deposition, but about which he lacks knowledge, and with which he failed to supplement his report; (2) what discontinuation rates might be if Lilly's clinical trials had been conducted differently; and (3) criticisms of Lilly for Glenmullen's perceived discovery issues. Most of Glenmullen's testimony regarding the Lilly documents pertains to Lilly's conduct and motives—which the Court excluded *supra*. Additionally, as noted above, Glenmullen may

8

As a preliminary matter, the Court notes that Glenmullen is qualified to testify regarding the definition of and diagnostic criteria for MDD. He is also qualified to apply these diagnostic standards to a hypothetical. Thus, for example, Glenmullen may be told to assume that a patient exhibits certain symptoms (such as those described by Herrera with respect to her condition in 2007) and on that basis to opine regarding whether he believes that hypothetical patient suffers from MDD. Under this example, Glenmullen's opinion regarding the hypothetical patient would be admissible. However, whether Glenmullen may opine on whether Herrera suffered from MDD in 2007 presents a different question from these scenarios.

Glenmullen bases his opinion that Herrera did not suffer from MDD in 2007 on his review of depositions taken in this case (including Herrera's testimony describing her condition in 2007), her medical records from 2009 and later, and Glenmullen's hour-long phone interview of Herrera. (Paley Decl. in Support of Supp. Mot. to Exclude Glenmullen ("Supp. Paley Decl. re Glenmullen"), Ex. A, at 3–7). Glenmullen never met Herrera before rendering this opinion. (Supp. Paley Decl. re Glenmullen, Ex. C, at 13:11–14:13.) Glenmullen did not and could not review Herrera's medical records from 2007—the parties have been unable to locate those records. (*Id.* at 18:5–11; 76:3–20.) Additionally, Glenmullen admits that at the time of Braunstein's deposition, Braunstein had "no real memory" of treating Herrera and apparently confused Herrera with another patient. (Supp. Paley Decl. re Glenmullen, Ex. A, at 5.) Glenmullen's analysis was also based, in part, on his erroneous understanding of her medical history. Though Glenmullen's report states that Herrera had never been prescribed psychiatric medication before Braunstein prescribed an antidepressant for her, Herrera's pharmacy records indicate that a different doctor prescribed Zoloft for her in 2001. (Supp. Paley Decl. re Glenmullen, Ex. A, at 7; Paley Decl., Ex. 7.)[3] In sum, Glenmullen bases his opinion on little more than Herrera's testimony and phone interview. Such evidence is insufficiently reliable to

not speculate regarding what the results might have been if Lilly's clinical trials were conducted differently. Finally, Glenmullen has no expertise relevant to Lilly's behavior during discovery. Accordingly, he may not testify regarding Lilly's conduct during discovery.

---

[3] In his deposition, Glenmullen acknowledged this error and stated that he does not believe that it will affect his conclusions. (Paley Supp. Decl. re Glenmullen, Ex. C, 74:15–75:20.)

9

1  support Glenmullen's conclusion regarding Herrera's condition in 2007.  *See TYR Sport, Inc. v.*
2  *Warnaco Swimwear, Inc.*, 709 F. Supp. 2d 821, 834 (C.D. Cal. 2010) (excluding expert report as
3  unreliable because it was not based on sufficient facts or data).  Moreover, Plaintiffs fail to
4  submit any evidence indicating that the method by which Glenmullen arrived at his conclusion is
5  the product of a reliable method reliably applied to the facts of this case.  *See* Fed. R. Evid. 702.
6  Finally, Plaintiffs fail to show how such testimony is relevant to the case at bar.  *See* Fed. R.
7  Evid. 401 & 402.  Accordingly the Court EXCLUDES this testimony.

8  Glenmullen's opinions regarding Herrera's other medical conditions are also flawed.
9  Glenmullen is a psychiatrist.  As he readily admits, he lacks the expertise to evaluate whether
10 Herrera was correctly diagnosed with hypothyroidism or perimenopause.  (Paley Sup. Decl. re
11 Glenmullen, Ex. C, at 97:4–15.)  Nevertheless, he opines that Plaintiffs' endocrinology expert's
12 opinions regarding Herrera's diagnoses with hypothyroidism and perimonopause are "very
13 credible." (*Id.* at 98:4–22.)  Credibility determinations are not a proper subject of expert
14 testimony, see *United States v. Candoli*, 870 F.2d 496, 506 (9th Cir. 1989); nor may Glenmullen
15 testify outside his area of expertise.

16 Similarly, Glenmullen may not opine regarding what other witnesses' testimony means.
17 Thus, for example, Glenmullen may not opine regarding how Patel's deposition testimony
18 should be interpreted.  Such opinions are neither based on Glenmullen's expertise nor helpful to
19 the trier of fact.  They are also little more than speculation.  *See Howard v. Ryder Truck Rental,*
20 *Inc.*, 561 F. App'x 588 (9th Cir. 2014) (mem.) (affirming exclusion of expert report addressing
21 matters within average layperson's common knowledge); *Rambus Inc.*, 254 F.R.D. at 606.

22 For the aforementioned reasons, the Court GRANTS IN PART Lilly's motion and
23 EXCLUDES Glenmullen's testimony regarding the following issues: (1) whether Herrera
24 actually had MDD in 2007; (2) whether Herrera was properly diagnosed with perimenopause
25 and hypothroidism; and (3) the meaning of certain fact witnesses' testimony.  However,
26 Glenmullen may still testify, *inter alia*, that Herrera's purported symptoms (assuming she
27 experienced those symptoms) are consistent with Cymbalta discontinuation symptoms.  He may
28 also testify that in his expert opinion, the nature of her symptoms plus the alleged sudden

10

1  unprecedented increase in severity of Herrera's symptoms immediately after discontinuing
2  Cymbalta indicates that her symptoms were caused by Cymbalta discontinuation.

3  **B.  Dr. Louis Morris**

4  Plaintiffs offer Morris's testimony regarding the adequacy of Cymbalta's label. Morris
5  has submitted both an initial and a supplemental report regarding this case. Lilly moves to
6  exclude Morris's testimony in its entirety.

7  Morris holds a Ph.D. in social psychology. (Paley Decl. in Support Mot. to Exclude
8  Morris ("Paley Decl. re Morris"), Ex. A, at 1, 16.) He worked as a social science research
9  specialist with the FDA from 1974 until 1997. (*Id.*) From 1986 until 1991, Morris was the
10 Acting Director of the FDA's Division of Drug Advertising and Labeling. (*Id.*) From 1981 until
11 1991, he was Chief of the FDA's Drug Research, Education and Labeling Branch. (*Id.* at 16.)
12 Additionally, from 1991 to 1997, he was the Chief of the FDA Marketing Practices and
13 Communication Branch. (*Id.*) Much of Morris's experience at the FDA involved evaluating
14 consumer-oriented (rather than physician-oriented) materials. *See, e.g.*, (Paley Decl. re Morris,
15 Ex. B, at 32:8–24.) Morris also dealt with some issues involving physician-oriented
16 materials—such as a project investigating the possibility of using class labeling and another
17 involving the revision of the formats for physician labels. (*Id.* at 28:12–20; 34:3–21.) From
18 1998 to 2000, Morris was Senior Vice President of SCP Communications—a company that
19 aided pharmaceutical companies to launch new drugs. (*Id.* at 2.) Morris is currently the
20 president of Louis A. Morris & Associates, Inc.—a "regulatory, consulting and research firm for
21 pharmaceutical, health care, advertising and communication companies." (*Id.* at 1.) He is also
22 an adjunct professor at the Temple University School of Pharmacy. (*Id.*)

23 Morris offers numerous opinions regarding Cymbalta's label. In particular, he opines
24 that "[a] reader would interpret the [Cymbalta label's] phrase 'the following symptoms occurred'
25 to mean that in the aggregate, the following symptoms occurred, not that 'each' of the following
26 symptoms occurred." (Paley Decl. re Morris, Ex. A, at 10.) Morris cites no authority for this
27 proposition. In his supplemental report, Morris responds to Lilly's labeling expert's opinions
28 and expands on his prior opinions. Morris there considers the FDA's guidance to drug

manufacturers regarding labeling and opines that the Cymbalta label is inconsistent with this guidance. He also opines that Lilly could have altered the Cymbalta label to more accurately reflect the data in the 2005 JAD Article and that neither the FDA guidance on "frequency" nor "class labeling" would have stood in the way.

Lilly argues that Morris's opinions should be excluded because he does not arrive at his conclusions by using a reliable methodology. With their Opposition, Plaintiffs submit Morris's declaration, in which he (for the first time) asserts that he arrived at his conclusions by using the same method that the FDA uses to evaluate promotional material and product labels.[4] (Morris Decl. ¶ 8.) Morris asserts that he gained significant experience reviewing "promotional materials and the labeling of prescription drugs" while working at the FDA. (*Id.* at ¶ 4.) He asserts that the process he used to determine Cymbalta's label's truthfulness is similar to the process he has used to determine whether claims made in promotional labeling and advertising are truthful[.]" (*Id.*) For promotional material, he works "backwards" by "examining promotional material for communicated claims and then examine [sic] the product label for consistency and, if necessary, [he] examine[s] data supporting these claims to understand the substantiation and meaning of the facts underlying those claims." (*Id.* at ¶ 5.) He asserts that he used a "similar" process to arrive at his conclusions in this litigation—treating the data in the 2005 JAD Article regarding discontinuation symptoms as the source to be substantiated. (*Id.* at ¶ 6.) According to Morris, this "type of expert review" is the same process that the FDA uses to analyze promotional material and to review product labels. (*Id.* at ¶ 8.) Morris asserts that the FDA "relies on experts *with sufficient training and experience* to determine whether information presented in product labels and advertising is truthful and supported by sufficient data." (*Id.*) (emphasis added).

First, even assuming *arguendo* that Morris's assertions regarding the FDA's procedures are correct, Plaintiffs still fail to show that Morris's conclusions are the result of reliable methods reliably applied. *See* Fed. R. Evid. 702. The FDA relies on analysis of this type

---

[4] In light of the Court's decision to exclude all of Morris's testimony to which Morris's supplemental report relates, the Court DECLINES TO REACH Lilly's motion to exclude Morris's supplemental report.

12

performed by experts with *sufficient* training and experience. Morris is a social psychologist with substantial regulatory experience. He is not a clinical psychologist and has never prescribed medication to patients. (Paley Decl. re Morris, Ex. B, at 71:5–17.) He admits that he is not an expert in discontinuation syndrome. (*Id.* at 72:5–11.) In his deposition, Morris did not recall conducting any focus groups involving physicians with SSRIs or SNRIs. (*Id.* at 73:6–12.) Morris admits that he did not review the raw data underlying the 2005 JAD article. (*Id.* at 82:2–10.) Finally, Morris admitted that he was "happy" to talk to Glenmullen so Glenmullen could clarify some of the questions that Morris had—including questions about how the discontinuation effects were measured in the clinical trials. (*Id.* at 63:15–64:16.) Moreover, Morris does not claim that the FDA typically reviews published articles summarizing and analyzing raw data rather than the raw data itself. Thus, to the extent that Morris seeks to opine regarding whether Cymbalta's label adequately represents the data submitted to the FDA under the FDA's own guidelines, he fails to show that he followed the FDA's process of comparing the data to the label.

      Morris's opinion is similarly inadmissible to the extent that he opines regarding whether Cymbalta's label is inadequate as a matter of semantic and linguistic interpretation. Morris is not offered as an expert in the English language or grammar. He does not claim to base his interpretation on focus groups or similar studies. (*Id.* at 66:19–67:2.) Additionally, Morris is not a medical doctor and has no experience in prescribing drugs. (*Id.* at 27:7-16.) Instead, he relies on his own examination of the label's "precise language" and "how the information was communicated"—including the "broader context which influenced the meaning conveyed[.]" (Morris Decl. ¶ 7.) Morris thus fails to show that he is qualified to render this opinion or that this opinion is the product of reliably applied methods.

      Moreover, Plaintiffs fail to show that Morris is an expert that the FDA would entrust to evaluate Cymbalta's label—i.e. one with sufficient training and experience to determine whether the information in Cymbalta's label is truthful and supported by sufficient data. *Cf. In re Diet Drugs (Phentermine, Fenfluramine, Dexfenfluramine) Products Liab. Litig.*, No. MDL 1203, 2000 WL 876900, at \*11–12 (E.D. Pa. June 20, 2000) (finding that doctors who lacked

1  regulatory expertise were qualified to opine on medical facts and science and to compare that
2  knowledge to the drug labels' text, but not qualified to opine regarding the label's compliance
3  with federal regulations). Thus, Plaintiffs fail to show that Morris actually followed the FDA's
4  methodology.

5  Third, Morris opines simply regarding how a generic "reader" would interpret this
6  statement; he does not purport to opine specifically on how physicians would interpret it. To the
7  extent that Morris purports to opine on how any reader would understand Cymbalta's label, his
8  opinion does not rely on his particular expertise and is thus unhelpful to the trier of fact. The
9  label's key statement—"the following symptoms occurred"—is not a technical term or some
10 other term of art. Interpretation of the label's non-technical wording as a matter of the English
11 language is well within the average layperson's ability. *See Howard*, 561 F. App'x 588 (9th Cir.
12 2014) (mem.); *Am. Home Products Corp. v. Johnson & Johnson*, 436 F. Supp. 785, 792-93
13 (S.D.N.Y. 1977) *aff'd*, 577 F.2d 160 (2d Cir. 1978) (excluding expert testimony concerning
14 advertisements' interpretation because, *inter alia*, the experts' testimony was not "particularly
15 enlightening or helpful"). Contrary to Plaintiffs' assertion, a reasonable jury is quite capable of
16 reading different iterations of the Cymbalta label closely and paying attention to nuanced
17 differences between versions. Moreover, the relevant inquiry is how a prescribing doctor would
18 understand the label—Morris is not a doctor and has not studied doctors' interpretations of
19 Cymbalta's label. He is thus unqualified to render this opinion based on his own experience; it is
20 also not the result of reliable methods.

21 In sum, Plaintiffs fail to show that Morris's opinion regarding Cymbalta's label's
22 adequacy is based on sufficient data regarding physicians' knowledge or sufficiently related to
23 Morris's expertise. *See Calisi v. Abbott Labs.*, No. CIV.A. 11-10671-DJC, 2013 WL 5441355,
24 at *6–10 (D. Mass. Sept. 27, 2013) (excluding regulatory expert's opinion regarding drug label's
25 adequacy where the FDA expert was not a doctor and offered "almost no facts to form the basis
26 for his 'adequacy' opinion as it relate[d] to prescribing doctors").

27 Additionally, neither Morris's description of the European Union Cymbalta Label nor his
28 summary of the *QuarterWatch* report relies on his expertise. His expert testimony on these

subjects is therefore improper. *See Rambus Inc.*, 254 F.R.D. at 606 (excluding expert opinion where expert's report made clear that he was aware of certain information but the report failed to analyze that information).

Notwithstanding the foregoing, Morris is qualified to testify regarding the FDA's general procedures, practices, relevant regulations and other FDA Guidelines. Similarly, Morris is qualified to opine regarding whether applicable laws and regulation would have permitted Lilly to modify Cymbalta's label. Nevertheless, it is not immediately apparent to the Court how such testimony will be relevant. During the pretrial conference held on July 29 and 30, 2015, Plaintiffs represented that Morris is largely offered to rebut Lilly's anticipated defense. Accordingly, the Court designates Morris as a rebuttal witness who will not be permitted to testify during Plaintiff's case in chief. Instead, Morris will be permitted to testify as a rebuttal expert regarding the matters that the Court identified above as being within his expertise—but only to the extent that such testimony is relevant in light of the record then before the Court. Morever, the Court may amend this ruling or permit Plaintiffs to reopen their case in chief if the Court sees fit to do so based on the record's development during trial.

In light of the foregoing, the Court GRANTS IN PART Lilly's motion to exclude Morris's proffered testimony and further designates Morris as a rebuttal expert.

**IV.  ORDER**

1. In light of the foregoing, the Court GRANTS IN PART Lilly's motions to exclude Glenmullen and EXCLUDES Glenmullen's testimony regarding:

> (1) physicians' general methods of researching and informing themselves about drugs those physicians prescribe;
>
> (2) whether physicians generally credit the drug label over other sources,
>
> (3) whether physicians would have been aware of the 2005 JAD Article;
>
> (4) whether Lilly buried the clinical results by publishing the 2005 JAD Article in a purportedly obscure journal;
>
> (5) whether Cymbalta's label adequately represents the severity of potential discontinuation symptoms;
>
> (6) whether the results of clinical trials would have been different if Lilly had employed different methods;
>
> (7) Lilly's corporate motive and conduct—including recounting the history of

15

> Lilly's clinical studies, marketing efforts, and publication of the 2005 JAD Article;
>
> (8) whether Herrera was correctly diagnosed with MDD in 2007;
>
> (9) whether Herrera was properly diagnosed with perimenopause and hypothroidism;
>
> (10) the credibility and proper meaning of other witnesses' testimony; and
>
> (11) summarizing the *QuarterWatch* report.

2. In light of the foregoing, the Court FINDS that Glenmullen MAY TESTIFY regarding:

> (1) the Cymbalta clinical studies and data that he reviewed—including the methods employed, the way the data was obtained, how various studies differ from each other, and whether and why he credits some studies over others;
>
> (2) that Cymbalta can cause discontinuation symptoms;
>
> (3) the nature of the discontinuation symptoms that Cymbalta can cause;
>
> (4) the correlation between half-life length and the risk of discontinuation symptoms;
>
> (5) that based on Cymbalta's half-life, a reasonable drug manufacturer should have known that Cymbalta carried a significant risk of discontinuation symptoms;
>
> (6) whether, assuming Herrera experienced the symptoms she alleges, those symptoms are consistent with Cymbalta discontinuation; and
>
> (7) whether it is Glenmullen's professional opinion that, the nature and timing of Herrera's symptoms indicate that they were caused by Cymbalta discontinuation;

Thus, to the extent that Lilly's motions relate to these topics, the motions are DENIED.

3. For the aforementioned reasons, the Court ORDERS Plaintiffs to provide to Defendant a declaration from Glenmullen addressing Glenmullen's consideration of and/or reliance on the various clinical studies of Cymbalta that he lists in the index to his June Supplemental Report. Glenmullen's declaration must provide a detailed and thorough description of:

> (1) how he considered each study;
>
> (2) whether he relied on each study;
>
> (3) if he relied on the study, the nature of his reliance;
>
> (4) if he did not rely on the study, his reason for not relying on it.

Plaintiffs SHALL produce Glenmullen's declaration to Defendant and the Court by noon on Sunday August 2, 2015. Until this declaration is produced, the Court DECLINES TO REACH the admissibility of Glenmullen's opinion that Cymbalta's label is inadequate in his expert opinion as a clinical psychiatrist.

16

4. For the aforementioned reasons, the Court GRANTS IN PART Lilly's motion to exclude Morris and EXCLUDES all of Morris's proffered opinions EXCEPT his testimony regarding:

> (1) the FDA's regulations, standards, procedures, and guidelines in general; and

> (2) whether the FDA's regulations, standards, procedures, and guidelines would have permitted Lilly to amend Cymbalta's label—i.e. that it was not impossible for Lilly to amend the label in light of the "Changes-Being-Effected" regulations.

The Court further DESIGNATES Morris as a rebuttal witness who will not be permitted to testify during Plaintiff's case in chief. Instead, Morris will be permitted to testify in rebuttal regarding the two allowable topics described above. However, he will only be permitted to testify to the extent that such testimony is relevant in light of the record then before the Court. Morever, the Court may amend this ruling or permit Plaintiffs to reopen their case in chief if the Court sees fit to do so based on the record's development during trial.

**IT IS SO ORDERED.**

Dated: July 31, 2015

　　　　　　　　　　　　　　　　　　　　STEPHEN V. WILSON
　　　　　　　　　　　　　　　　　　　　United States District Judge